## MITCHELL *v*. FISH.

### Opinion delivered January 23, 1911.

CONTRACT—ILLEGALITY—ENFORCEMENT.—Although a contract of partnership between a man and a woman was tainted with illegality or immorality, yet, if the contract has been executed by the voluntary acts of the parties and a division of profits agreed upon, the courts will enforce the settlement by requiring an accounting of profits.

Appeal from Lawrence Chancery Court; *George T. Humphries,* Chancellor; reversed.

C. J. Mitchell instituted this action in chancery court against Al Fish to recover the profits due her from an alleged partnership between them. The facts are substantially as follows:

The plaintiff states that in 1899 she was living with her husband in Leadville, Colorado; that they did not get along well together, and on August 5, 1899, she left her husband without securing a divorce from him, and went to Wardner, Idaho, in company with the defendant, Al Fish; that neither of them had any money or property at the time they left together, and that they made an agreement whereby she was to live with defendant as his wife until she could secure a divorce from her husband, and that in the meantime they would manage their affairs as a partnership, each to contribute his labor and property in the joint enterprise and to share equally the profits and losses; that they carried out the terms of this agreement, and in 1902 homesteaded a tract of land in the State of Washington; that up to this time they had accumulated practically nothing; that from the time they moved on the homestead until they sold it in September, 1908, she stayed on it and helped to improve it; that she helped to clear it, to put in crops and to build and erect improvements on it; that she also kept boarders, took in washing and did everything to help get along; that during this time the defendant worked a part of the time in the mines and spent the remainder on the homestead, both working and expending what they had separately earned in improving the place; that the homestead was proved up in the defendant's name as the head of the family; that they sold the land in September, 1908, and she signed the deed as the wife of the defendant; that the net amount received for it and the personal property they had accumulated on the place, after deducting the commission of the agent who sold it, was $6,100; that each of them took $500 out of the proceeds of the sale; that it was further agreed that she was entitled to and could draw up to $2,500 of the remainder. She, however, left the money in his hands, and told him to do the best he could with it in investing it. It was understood between them that he should come South and invest the money

for them jointly in other lands. The plaintiff remained in the West for the purpose of securing a divorce from her husband, and when that was accomplished it was understood that she and defendant were to marry. The defendant came South, and purchased the lands described in the complaint with a part of the proceeds arising from the sale of the homestead in Washington.

The defendant for himself admitted that plaintiff left her husband and lived with him as his concubine during the time testified to by her. He also admits the sale of the homestead in Washington for the price named by her, and that he gave her $500 out of the proceeds of the sale thereof. He denied however that there was any agreement of partnership between plaintiff and himself. Says that he gave her the $500 out of the proceeds of the sale of the homestead because she was poor and needed it, and he was going to leave her. Defendant admits that he came South and invested $1,600 of the money from the sale of the homestead in Washington in the lands described in the complaint, taking the title thereto in his own name. He says that he has spent most of the remainder of it. He kept up a correspondence with plaintiff until he came to Arkansas and married. He claims that the improvements on the Washington homestead were worth only about $250, and denies that plaintiff performed much service in helping to improve it.

Plaintiff, however, in rebuttal, introduced several of their old neighbors in the State of Washington, who testified that the improvements on the homestead were worth $1,500 or $2,000; that plaintiff was a hardworking industrious woman, and performed the greater amount of labor in improving the homestead, and that she remained on it constantly, working, looking after it, and taking care of it while defendant was away.

After the defendant left Washington, plaintiff secured a divorce from her husband, and on her way to this State to see defendant and look after the interest met a man whom she subsequently married.

The decree of the court in part recites: "And, plaintiff requesting that the court make its findings of fact as to whether or not there was a contract of partnership between the parties and a community of interest between them in the proceeds of the sale of the property in the hands of the defendant, the court

finds that there was a partnership between the parties and a community of interest between them in the funds arising from the sale of the property, but further finds that said contract of partnership was so tainted with immorality that the court will not enforce said contract of partnership or sustain plaintiff's action for a division of the proceeds of said sale of said property in the hands of the defendant. It is therefore considered, ordered and decreed that plaintiff's action herein be and hereby is dismissed for want of equity; that defendant have judgment against her for his costs herein."

The plaintiff has duly prosecuted an appeal to this court.

*A. S. Irby*, for appellant.

Appellant does not seek by this action to compel appellee to live with her in an unlawful relationship, nor to enforce a specific agreement to convey to her an interest in land entered as a homestead in his name, but she does seek the enforcement of appellee's agreement that he would hold the fund of $5,000 or upwards, and invest the same in property for their mutual benefit. If it be conceded that the transactions out of which this fund arose were connected with a relationship which was illegal, it does not follow that this specific agreement will not be enforced. 9 Cyc. 557; 15 U. S. (Law. Ed.) 385; 17 U. S. (Law. Ed.) 732; 60 Am. St. Rep. 509; 38 Am. Rep. 631; 49 Tex. 89; 20 Fed. 107; 5 Fed. 584.

*J. F. Gautney*, for appellee.

All the transactions between these parties were immoral, illegal, nonenforceable. There is no sufficient proof of a partnership, which the law would recognize, nor anything received or accumulated during the time they lived together which the law would recognize as a joint fund in which appellant had any interest. 58 Ala. 303 (29 Am. Rep. 748); 36 Ala. 180; 174 U. S. 639, 43 Law. Ed. 1117; 9 Am. & Eng. Enc. of Law (1 ed) 921; 46 Am. Dec. 415; 1 Houst. (Del.) 335; 12 B. Mon. (Ky.) 285; 57 Hun (N. Y.) 292; 105 S. W. 435; 99 S. W. 601; 68 S. W. 118; 35 Am. Rep. 67; 40 Am. Rep. 595.

Hart, J. (after stating the facts). In the case at bar the court found that a partnership had existed between the plaintiff and defendant, and that there was community of interest between

them in the funds arising from the sale of the property, but refused to give plaintiff the relief prayed for because the contract of partnership was tainted with immorality.

The finding of the chancellor that there was a partnership was not contrary to the weight of the evidence, and, according to the settled rules in this State, his finding in that regard will be sustained. We are of the opinion, however, that he was wrong in dismissing plaintiff's complaint for want of equity. Her suit was not brought to enforce the contract of partnership or any of its stipulations. The partnership was ended when the property was sold. All of the partnership property consisted of the homestead in the State of Washington and the personal property situated on it. According to the testimony of the plaintiff, the partnership enterprise in which she and the defendant had been engaged had been fully completed, and they had voluntarily agreed upon a division of the profits; that, pursuant to this agreement of division, she had $2,500 as her share of the profits, which she permitted defendant to keep for her for reinvestment. It is true that defendant denies this; but we think that, when the conduct of the parties and the circumstances in connection therewith are duly considered, the testimony of the plaintiff is entitled to more credence than that of the defendant. In this view of the case, the question whether the contract of partnership at the time it was formed was void as against public policy is not the controlling question in the case, but the question is whether or not one partner, having received the profits of the partnership and having voluntarily agreed with his co-partner to a division thereof, is liable to such other for his share of the profits.

"Although a contract may be illegal, it does not follow that it is illegal or immoral for the parties to it, after its completion, to fairly settle and adjust the profits and losses which have resulted from it. The vice of the contract does not enter into such settlement." *DeLeon* v. *Trevino,* 49 Tex. 88.

The court said: "In the case of *Brooks* v. *Martin,* on a bill in equity by one partner against the other to set aside a contract of sale of his interest in the partnership venture, the Supreme Court of the United States held that, 'after a partnership contract confessedly against public policy has been carried out and money

contributed by one of the parties has passed into other forms, the results of the contemplated operation completed, a partner in whose hands the profits are can not refuse to account for and divide them on the ground of the illegal character of the original contract.' (2 Wall. 70.) Now, surely, if the court will lend its aid to compel an accounting, and enforce the payment of the amount found to be due by one partner to the other, it can not be that it should interpose to relieve one of the partners from his voluntary accounting on the ground of illegality of the original partnership enterprise, which, after completion, had been thus voluntarily settled and adjusted.

"In the case of *Planters' Bank* v. *Union Bank,* 16 Wall. 483, the court again says: 'Nor should the court have charged that, in the circumstances of this case, no action would lie for the proceeds of the sale of Confederate bonds which had been sent by the plaintiffs to the defendants for sale, and which had been sold by them, though the proceeds had been carried to the credit of the plaintiffs, and made a part of the account. It may be that no action would lie against a purchaser of the bonds, or against the defendants, on any engagement made by them to sell. Such a contract would have been illegal. But when the illegal transaction had been consummated, when no court has been called upon to give aid to it, when the proceeds of sale have been actually received, and received in that which the law recognized as having value, and when they have been carried to the credit of the plaintiffs, the case is different. The court is then not asked to enforce an illegal contract. The plaintiffs do not require the aid of any illegal transaction to establish their case.' " See also *Pfeuffer* v. *Maltby,* 54 Tex. 461; *Wegner* v. *Biering,* 65 Tex. 511; *McBlair* v. *Gibbes,* 17 How. (U. S.) 232.

In discussing the principles of law applicable to a state of facts similar to those presnted in the record, the court in the case of *Morgan* v. *Morgan,* 1 Tex. Civ. App. 319, said:

"Applying these principles to the case at bar, if it be conceded that the relations of John E. Morgan and appellant were illegal, and that their contract to live together and divide the property they might accumulate would not sustain an action in behalf of either of them if brought thereon, still we believe it can not be said that, after the contract has been voluntarily exe-

cuted by both and the property has been acquired, the courts will refuse to recognize their respective interests therein."

In this view of this case, it is not necessary to decide whether the relation of concubinage between the parties to this suit was incidental, and was not the motive and cause of them living together as husband and wife and forming the partnership; for we hold that, although the partnership may have been illegally formed on account of the consideration for it being the living together of the parties illegally as husband and wife, yet when the contract has been executed without the aid of the courts by the voluntary acts of the parties and a division of the profits has been agreed upon, such division of profits forms a new contract, which is collateral to and not contaminated by the original contract, and that the partner entitled to a share of such profits may enforce his right therto in the courts.

It follows that the court erred in dismissing the complaint, and the decree will be reversed, and the cause will be remanded with directions to the chancellor to enter a decree not inconsistent with this opinion.