Submitted on briefs February 15, affirmed May 1, 1923.

# ROSENKRANTZ ET AL. *v.* BARDE.

### (214 Pac. 893.)

**Pleading—Admission in Reply Qualified by Pretended Admission of a Fact not Pleaded by Opposite Party Equivalent to Unqualified Admission.**

1. In an action for breach of contract where the plaintiff alleged an agreement between the parties to purchase merchandise at an auction sale and divide the profits, and the answer alleged that a named individual other than defendant was the successful bidder, an admission in the reply that defendant attended said sale, and that the said named individual "bidding in conjunction with the defendant" was the successful bidder at said sale, was an admission of the allegation of the answer; the clause quoted adding nothing to the admission and should be disregarded.

**Contracts—Plaintiff must Show Performance to Recover for Breach.**

2. Plaintiffs could not recover for defendant's breach of contract to bid in merchandise at an auction sale and divide the profits with plaintiffs, where it was agreed that each of the parties would contribute one sixth of the price bid, without showing that they performed their part of the contract so far as within their power.

**Joint Adventures—Tender—Where Evidence Failed to Show Tender by Plaintiffs of Money to be Furnished and Money not Brought into Court, Plaintiffs Could not Recover for Breach of Contract.**

3. In an action for breach of contract for the joint purchase of merchandise at auction and the division of profits, where there was no evidence that plaintiffs made tender of the amounts to be contributed by them, and the tender, if any made, was not kept good by bringing the amount thereof into the registry of the court, they could not recover.

**Contracts—Plaintiffs cannot Recover Profits Under Contract for Suppression of Bidding.**

4. Where plaintiffs and defendant entered into a contract whereby defendant was to purchase, at public auction, arms and ammunition seized by the United States from a vessel violating the neutrality laws, the object of which contract was the suppression of real competition in the bidding, the contract was illegal, and plaintiffs were not entitled to recover on the refusal of the purchaser to divide the resulting profits.

**Contracts—Recovery not Allowed Where Necessary Proof Involves Showing Contract Illegal.**

5. Where it was necessary for plaintiffs, in order to recover profits for defendant's breach of contract, to allege and prove that

---

4. General rule that courts will not consider illegal contracts, see notes in 23 L. R. A. (N. S.) 478; L. R. A. 1917A, 446.

the subject matter of the contract was the joint agreement to stifle competition at a public sale and so procure the property for much less than its value, plaintiffs could not recover.

#### Contracts—Evidence Held to Show Illegal Contract for Stifling Bidding.

6. Evidence *held* sufficient to show that contract on which plaintiffs sought to recover was illegal as an agreement, by the stifling of competition at public sale, to procure the merchandise at much less than its real value.

#### Contracts—Court will Dismiss for Illegality of Contract Regardless of Pleadings or Wishes of Parties.

7. In· an action for the breach of contract where the illegality of the contract appears from the complaint or the plaintiffs' case, the court will, at any stage of the proceeding, dismiss the action, although such illegality is not pleaded as a defense or insisted ·upon by the parties, and may have been expressly waived by them, as it is an objection which the court itself, in the due administration of justice, must raise regardless of the wishes of the parties.

#### Contracts—Equity will not Relieve Parties in Pari Delicto.

8. Equity will not give relief to the parties to a contract, illegal by reason that its purpose is to stifle competition in the bidding at a public sale of merchandise, since all the parties to such contract are in *pari delicto*, and none of them is entitled, either in law or equity, to complain of an appropriation of the proceeds of such contract by one of their number.

From Multnomah: ROBERT TUCKER, Judge.

In Banc.

For appellants there was a brief over the names of *Mr. W. H. Abel* and *Mr. George Estes.*

For respondent there was a brief over the name of *Messrs. Dey, Hampson & Nelson.*

AFFIRMED.

BURNETT, J.—It appears from the record that the United States government had seized and condemned a cargo of arms and ammunition carried by a vessel violating the neutrality laws and had ad-

---

7. Right or duty of court on its own motion to dismiss action based on illegal contract, see notes in **Ann. Cas. 1912A, 1033; Ann. Cas. 1915B, 230.**

vertised them for sale at Aberdeen, Washington. It is alleged in the complaint and admitted in the answer:

"II.

"That prior to the date of said sale, plaintiffs and defendant entered into an agreement, whereby the said parties agreed that defendant should bid at said sale for and on behalf of said parties, each of said parties promising and agreeing to contribute 1/6 of any sum bid at said sale by defendant, not to exceed the sum of $30,000.00, the profits and expenses of said sale to be shared equally by the said parties; that plaintiffs and each of them were then, and at all times hereinafter mentioned have been ready, willing and able to contribute one-sixth of any sum within the said limit; that in consideration of said agreement defendant was appointed, and agreed and consented to act for and on behalf of all of said parties at said sale."

The complaint continued as follows:

"III.

"That thereafter defendant secretly and without the knowledge of plaintiffs, entered into an agreement with one W. Stokes Kirk, whereby the said Kirk, bidding at said sale on behalf of himself and defendant in equal shares, purchased the said property for the sum of $9,650.00; that plaintiffs upon learning of the said agreement between the said Kirk and the defendant and the purchase of the said property at said sale thereunder, tendered to defendant their proportionate shares of the sum paid by defendant for the said half interest in the said property.

"IV.

"That defendant refused the said tender and refused to set over to plaintiffs any share in the said property; that plaintiffs have demanded an accounting of said transaction from defendant, which has been refused and is still refused; that plaintiffs are informed and believe and therefore allege that

defendant has received as profits from said sale the sum of $25,000.00.''

and this is denied by the answer. The plaintiffs pray for a decree against the defendant that he be compelled to account to them for five-sixths of the profits derived by him from the transaction. Further affirmative matter in the answer, after averring the advertised sale of the property, contains the following averments:

"II.

''That defendant attended said sale for the purpose of bidding, and that the plaintiffs advised the defendant of their purpose individually or collectively to make bids at said sale; that there were present at said time and place a motley crew of rag and junk men, and that the plaintiffs were only five out of twenty or thirty in said aggregation, and that all of the members thereof announced their intention of bidding notwithstanding their financial inability to purchase the said articles, no deposit being required, and volunteered to refrain from bidding in the event the defendant would admit the plaintiffs and the remainder of said aggregation to share in any profits which might be derived from a resale; that the said offer to refrain from bidding constituted the consideration for the demand and the attempted agreement referred to in the Complaint herein; that at said sale W. Stokes Kirk was the successful bidder; that thereafter the defendant inquired of plaintiffs and the remainder of the aggregation referred to whether they desired to form a pool with him to acquire the said property from Kirk for a sum then and there stated, but that the plaintiffs and the remainder of said aggregation connected with the said plaintiffs declined, and that the transaction between the defendant and the said Kirk was subsequent to the said sale and subsequent to the said declination on the part of the plaintiffs and the accompanying aggregation referred to to enter therein.''

The reply admits the allegation about the proposed sale and contains this further paragraph:

"For reply to Paragraph II of defendant's further separate answer and defense, plaintiffs admit that defendant attended said sale and that W. Stokes Kirk, bidding in conjunction with defendant, was a successful bidder at said sale and deny each and every other allegation contained in said paragraph and allege the facts to be as set forth in plaintiffs' complaint and not otherwise."

After the case was thus at issue, a trial was had at which the plaintiffs and their witnesses were present and testified and the defendant was not present, except by his counsel, and offered no testimony. The result was a decree dismissing the suit without allowing either party costs or disbursements against the other. The plaintiffs appealed.

Substantially, the testimony for the plaintiffs discloses that two of them became aware of the coming sale of the property and examined it with a view of bidding for it. After some investigation, they took in, one by one, the three other plaintiffs and formed a partnership to which each agreed to advance $5,000 or $25,000 in all, to bid on the cargo up to that amount and if successful in the purchase, to dispose of the property and share equally in the gains or losses of the transaction. Thus the matter stood on the morning of the sale when and where were present the five plaintiffs and the defendant. Upon inquiry, they found that he had attended for the purpose of bidding on the property and, after a very brief negotiation, they took him also into the partnership on condition that he likewise would advance $5,000, making the total capital of the concern $30,000. This all took place within the hour before the

sale. It is in the testimony that Mr. Egerer, one of
the partners, now deceased, made a bid on the prop-
erty. Afterwards, the plaintiff Rosenkrantz con-
ducted the bidding for some time on behalf of the
concern; whereupon, it is said that the defendant
suggested that he was more experienced in such mat-
ters and claimed the privilege of doing the bidding
which was agreed to. About the time the bids reached
the neighborhood of $9,500, the plaintiffs say that
there was a whispered consultation between the de-
fendant and one Kirk who up to that time had been
a rival bidder. What was said in that conversation
is not disclosed by the testimony but the evidence
shows that the defendant made no further bid and
when Kirk announced a bid of $9,650, and it seemed
apparent that the officer was about to strike it off to
him at that figure, one of the plaintiffs accosted the
defendant and asked him if he was going to let the
property go to Kirk at that figure when it is said
that the defendant replied, "We are protected."
Some of the witnesses further say, in substance,
that before the property was struck off to Kirk the
defendant announced to the marshal that he was in
that bid on equal shares and demanded that it be
put down to Barde and Kirk. The marshal how-
ever, refused to do this as he recognized Kirk only in
making the bid and accordingly it was struck off to
him, whereupon he remarked to Barde, "I am a man
of my word." The testimony further shows that the
sale occurred shortly before the lunch hour and
afterwards the defendant came to the plaintiffs
bringing an offer from Kirk to either give or take
$5,000 for the bargain. The plaintiffs were in favor
of buying at that figure and it is said that they put
their checks in the hands of one of their number,

Sussman, and arranged to meet Barde in Tacoma on the following Monday and close up the transaction. As they say, Barde did not attend at that time and they have never had any further transactions with him. There is no testimony tending to show that they tendered to Barde or to Kirk any portion of the purchase price of the property, or any part of the $5,000 they talked of paying to Kirk for the bargain.

1. As affecting the pleaded status of the parties in relation to the property, we note the answer says "that at said sale, W. Stokes Kirk was the successful bidder." The reply in response to that allegation reads thus:

"Plaintiffs admit that defendant attended said sale and that W. Stokes Kirk, *bidding in conjunction with the defendant,* was the successful bidder at said sale."

The answer nowhere intimates that Kirk was bidding in conjunction with the defendant: In *Woolsey* v. *Draper,* 103 Or. 103 (201 Pac. 730), Mr. Justice RAND wrote the following precept:

"The insertion into a pleading of a clause pretending to admit a fact not pleaded by the opposite party is not a proper way to plead, raises no issue, is not capable of being denied and should not be tolerated."

The doctrine was followed in *Loveland* v. *Warner,* 103 Or. 638 (204 Pac. 622). Under this rule therefore, the italicized clause, "bidding in conjunction with the defendant" is of no effect, adds nothing to the reply and properly is disregarded. Consequently it stands admitted by the pleadings that Kirk was the successful bidder at the sale, that is to say, Kirk became the owner of the property. It follows that if the plaintiffs would have an accounting from the

defendant concerning this property, they must show that by some contract regularly entered into with Kirk, they acquired some interest in the property itself which the defendant disposed of as their agent or as their partner. It is not in evidence that Kirk recognized or had any knowledge of the alleged relation of partnership between the plaintiffs and the defendant. For all that he said, "I am a man of my word," it does not show that he had contracted with the defendant to convey to him, either in his own right or to the partnership, any part of the property. What was said in the whispered conversation is not disclosed by the testimony. Although it is true that Barde directed the sale to be awarded to himself and Kirk, yet the marshal refused·to do so and there is no evidence that Kirk assented to that proposal. The record is utterly devoid of any proof that Kirk, the admitted "successful bidder," ever parted with any interest in the property which he bought, either to Barde or to the plaintiffs.

2, 3. Again, the plaintiffs allege an executory contract whereby each of them was to advance the sum of $5,000 to the partnership capital. They plead a covenant with the defendant with which they had themselves not complied. They essay to reap where they have not sown. They demand a gain from a venture into which they did not put a dollar. Before they can recover on any executory contract, they first must show that they themselves have performed the same so far as they could perform. Until then they cannot call upon the defendant to respond in damages or to render an account. Their allegation of tender to the defendant is without proof of any kind. Neither do they keep the tender

good by bringing the amount thereof into the registry of the court.

The case is argued largely in the briefs for and against the theory advanced by the defendant that the testimony shows an unlawful combination of the parties for the purpose of chilling the bidding at the sale and preventing the property from bringing an adequate price. The trial judge adopted this theory and dismissed the suit. The testimony shows very strongly that the condemned cargo was worth at least $100,000. The combination began between two of the plaintiffs and they enlarged it, one by one, until, according to their story, it included six, Barde being the last addition. That they entered into a combination to bid at the sale is patent. In *Kearney* v. *Taylor,* 15 How. 494 (14 L. Ed. 787), it is said:

"There are some cases deriving their principles from the severe doctrines of *Brexwell* v. *Christie,* Cowp. 396, and *Howard* v. *Castle,* 6 T. R. 642, to be found in books of high authority in this country, that would carry us the length of avoiding this sale, simply on the ground of this association having been formed for the purpose of bidding off the premises, for the reason that all such associations tend to prevent competition, and thereby to a sacrifice of the property. (Citing authorities.) Later cases, however, have qualified this doctrine, by taking a more practical view of the subject and principles involved, and have placed it upon ground more advantageous to all persons interested in the property, while at the same time affording all proper protection against combinations to prevent competition. (Citing authorities.)

"It is true that in every association formed to bid at the sale, and who appoint one of their number to bid in behalf of the company, there is an agreement, express or implied, that no other member will participate in the bidding; and hence, in one sense, it may

be said to have . the effect to prevent competition.
But it by no means necessarily follows that if the
association had not been formed, and each member
left to bid on his own account, that the competition at
the sale would be as strong · and efficient as it
would by reason of the joint bid for the benefit and
upon the responsibility of all. * *

"We must therefore look beyond the mere fact of
an association of persons formed for the purpose of
bidding at this sale, as it may be not only unobjection-
able, but oftentimes meritorious, if not necessary, and
examine into the object and purposes of it; and if,
upon such examination, it is found, that the object
and purpose are, not to prevent competition, but to
enable, or as an inducement to the persons composing
it, to participate in the biddings, the sale should be
upheld—otherwise if for the purpose of shutting out
competition, and depressing the sale, so as to obtain
the property at a sacrifice.

"Each case must depend upon its own circumstances;
the courts are quite competent to inquire into them,
and to ascertain and determine the true character of
each."

4. It is plain that in the instant case, the plaintiffs
were not trying to encourage bidding or to increase
competition so as to make the property bring a higher
price.  On the contrary, they were engaged in ab-
sorbing all opposition that appeared at all formidable.
They drew the inference from the conduct of Barde
and Kirk that the two of them had agreed to stifle
bidding and allow the property to go to Kirk when
Barde stopped bidding, as a result of the whispered
conversation between them.  Now, the plaintiffs seek
the benefit of that unlawful compact when, in fact,
they stood by, consenting to it.

Some of the precedents relied upon by the plain-
tiffs are here set down.  *McDonald* v. *Lund,* 13 Wash.
412 (43 Pac. 348), had to do with a case where money

collected by partners who conducted a gaming-house was divided and the plaintiff deposited his share with the senior partner upon the dissolution of the partnership. Resisting an action for the share thus determined, the senior partner contended that the money was the product of an unlawful business and that hence the plaintiff could not recover; but the court held that the illegal contract to engage in gaming had been fully executed and had passed into oblivion; that the liability of the defendant depended not at all upon that alleged iniquitous covenant but upon the new and different stipulation whereby the parties divided the money and legitimately agreed upon the share that each was to have. Also in *Frye v. Haskins*, 142 Iowa, 708 (23 L. R. A. (N. S.) 477), a partnership was carrying on business as real estate brokers. In a certain transaction, they acted as agents for both buyer and seller and one of the firm, having collected the commission, resisted the claim of his partner for his share of it on the ground that it was the proceeds of a transaction contrary to public policy because the same agent had. acted for opposing principals. The court held, not only that the contract having been executed, the partner had no right to keep the share of his copartner, but also that the illegality of double agency was taken out of the case by the knowledge and agreement of both principals. The precedent is not applicable to the present contention. In *State* v. *Baltimore & O. R. R. Co.*, 34 Md. 344, 366, it is said,

"It is the policy of the law not to aid the completion of an illegal contract; yet when that contract is at an end, the agent whose liability arises wholly by receiving the money for another's use can have no pretense to retain it."

In *Haacke* v. *Knights of Liberty Club,* 76 Md. 429
(25 Atl. 422), Haacke, as an officer of the club had
collected money belonging to it. At first he re-
fused to pay it over to the club because it had been
collected for services of the club rendered on Sunday
in violation of the Maryland Sunday law. After-
ward, on a week-day, he promised to pay it, but
defended a subsequent action on the ground that the
money was the product of an unlawful transaction.
His defense came to naught as a matter of law.
*Willson* v. *Owen,* 30 Mich. 474, narrates a successful
effort of a horse fair association to collect from its
treasurer, money which he held as such officer and
which was in part the product of illegal pool selling
at one of the association's fairs. In *Cheuvront* v.
*Horner,* 62 W. Va. 476 (59 S. E. 964), the plaintiff
placed $750 in the hands of the defendant with which
to effect a compromise of a divorce suit then pending
between the plaintiff and his wife. By fraud,
Horner obtained an agreement from the wife greatly
to her disadvantage, and paid her only $400.
Cheuvront sued for the return of the $350 less
some small reductions not in dispute. Contending
that the agreement compromising the divorce suit
was contrary to public policy, Horner maintained
that equity would leave the parties where it found
them. The court held thus: Whenever a case can
be made without invoking the aid of the illegal con-
tract, the plaintiff is entitled to recover; and also
that an agent cannot refuse to account for money
of his principal because it was intrusted to him to
be used illegally. *Andrews* v. *New Orleans Brewing
Association,* 74 Miss. 362 (20 South. 837, 60 Am. St.
Rep. 501), was an action for money had and re-

ceived.   The defendant urged that the money was
the proceeds of a liquor business carried on without
paying the statutory license fee.   According to the
syllabus, the court brushed aside this contention by
saying, "A party to a past transaction cannot with-
hold its gains from another party thereto on the
ground of its illegality." In *Mitchell* v. *Fish*, 97
Ark. 444 (134 S. W. 940, 36 L. R. A. (N. S.) 838),
the plaintiff had left her husband and formed a
partnership with the defendant by the terms of
which they were to live with each other as husband
and wife, accumulate property by their joint efforts
and have an equal interest therein.   By settlement
and residence thereon, they acquired a government
homestead which they improved and sold and the
court required the defendant to account to her for
her half of the proceeds on the principle that the
contract had been fully executed and that it was
unnecessary for the plaintiff to rely upon it to make
out her case.   *De Leon* v. *Trevino,* 49 Tex. 88 (30 Am.
Rep. 101), was a case where the plaintiff furnished
goods to the defendant at Matamoras in Mexico and
the defendant took them into Texas and exchanged
them for cotton which he returned to Matamoras,
all in supposed violation of the United States revenue
laws.   They settled their accounts as partners and
Trevino gave his notes to De Leon for the balance
due to the latter.   Trevino defended an action on the
notes on the ground that the original transaction
was unlawful, but the court held that after the il-
legal contract had been performed, it was competent
for the partners to settle with each other and make
a lawful agreement to pay the balance found to be
due from one to the other and that the turpitude of
the original agreement does not affect the new one.

5. The doctrine is prominent in the precedents cited by the plaintiffs that after an illegal contract has been fully executed and the parties thereto make a new ·one settling their· rights as between themselves, the latter contract governs their · relations. The original becomes *functus officio* and is no longer a factor to be reckoned with. Here the plaintiffs are seeking to enforce a contract they say they had with the defendant. According to their complaint, it is yet executory and he has repudiated it. Whatever may be the 'profit which he derived from the contract he had with Kirk after he had abandoned his agreement with the plaintiffs, they cannot share in it in any event without proving and resorting to the contract which they state in their complaint. The cases like *McDonald* v. *Lund* and *State* v. *Baltimore & O. R. R. Co.*, *supra,* would be applicable here if Barde had bid in the property, the plaintiffs had paid in their part of the purchase price and he had sold at a profit, after which a balance had been ascertained in settlement between them as coming from the defendant to the plaintiff. No accounting or settlement has been made. The parties have not framed any new or legitimate agreement. Avowedly they aim to enforce the original contract and compel an accounting and settlement. Their attitude, as disclosed by the record they bring before us, is not in harmony with the reasoning of the precedents they cite. If the contract was illegal, it furnishes no support to the plaintiffs' case. In any event, they must rely upon it if they would recover.

6. In our judgment, the actions of the plaintiffs clearly indicate an effort to prevent the property from being sold at anywhere near its reasonable value. In *McMullen* v. *Hoffman,* 174 U. S. 639 (43 L. Ed.

1117, 19 Sup. Ct. Rep. 839, see, also, Rose's U. S. Notes), the City of Portland had advertised for bids on various parts of the work of installing the Bull Run water system, whereby water from the Bull Run River was conducted approximately thirty miles through iron pipe to the City of Portland for the use of its inhabitants. The plaintiff and the defendant entered into an arrangement between themselves whereby both were to bid separately on various parts of the proposals advertised by the city authorities. In some instances, the plaintiff was to bid the low bid while the defendant would bid very much higher and, in other parts of the work, the reverse was to be the case, but in all instances each knew what bid the other intended to make. In the event of either receiving award of the work bid for, the other was to share equally in the profits. Treating on the subject after the citation of several precedents, the Supreme Court of the United States, speaking by Mr. Justice Peckham, said:

"We have here nothing to do with a combination of interest which is open and avowed, which appears upon the face of the bid and which is therefore known to all. Such a combination is frequently proper, if not essential, and, where no concealment is practiced and the fact is known, there may be no ground whatever for judging it to be in any manner improper.

"But in this case there is more even than concealment. There is the active fraud in the putting in of these, in substance, fictitious bids, in their different names, but in truth forming no competitive bids, and put in for the purpose already stated. It is not too much to say that the most perfect good faith is called for on the part of bidders at these public lettings, so far as concerns their position relating to the bids put in by them or in their interest. The

making of fictitious bids under the circumstances detailed herein is in its essence an illegal and most improper act; indeed, it is a plain fraud, perpetrated in the effort to obtain the desired result.''

7. In the instant case, the bids of Egerer, Rosenkrantz and Barde were *prima facie* evidence of legitimate competition; but were in fact collusive and calculated to deceive others. The whispered transaction between Barde and Kirk, upon which the plaintiffs rely, plainly had the effect of stopping the bidding at a ridiculously low price for the property sold. As stated, we have here, only the testimony on behalf of the plaintiffs. There was none offered for the defendant and it is said that he was not present at the trial. In *Jackson* v. *Baker,* 48 Or. 155 (85 Pac. 512), Mr. Chief Justice BEAN, delivering the opinion wrote thus:

''If the illegality appear from the complaint or the plaintiff's case, the court will, at any stage of the proceedings, dismiss the action, although such illegality is not pleaded as a defense, or insisted upon by the parties, and may have been expressly waived by them. It is an objection which the court itself is bound to raise in the due administration of justice, regardless of the wishes of the parties.''

There are numerous authorities cited in support of this doctrine and it is the settled rule in this state. The case presented is where the government was in the exercise of its function in selling condemned property. It was to the interest of the government, as a matter of public policy, that the property should bring as much as possible at the sale. The whole course of conduct on the part of the plaintiffs, Barde and Kirk, as narrated in the testimony, indicates a settled purpose to stifle competition, to

107 Or.—23

absorb all apparent opposition to their plans and to obtain the property at an absurdly low price. Such actions are clearly opposed to public policy and ought not to aid the plaintiffs in their efforts to profit by such transaction.

8. The plaintiffs further contend that they should receive consideration at the hands of a court of conscience because they are not *in pari delicto*. We cannot give heed to this contention. The delicts of the plaintiffs and of the defendant are identical and patterned on the same model. According to their own showing, the only distinction between them is that he appropriated the profits and they received nothing. This may heighten their disappointment but does not lessen their blame. There is presented a clear case of *in pari delicto* from which equity will not extricate the plaintiffs.

The suit of the plaintiffs must fail for these reasons:

1. They do not prove any contractual relation between themselves and Kirk, the admitted purchaser and hence owner of the property.

2. They do not show performance or tender of performance on their part of the executory contract between themselves and the defendant on which they rely.

3. The executory contract upon which their whole case depends is shown to be contrary to public policy.

The decree of the Circuit Court is affirmed, with costs and disbursements of this court in favor of the defendant.                    AFFIRMED.