Argued September 14; affirmed October 16; rehearing denied
December 11, 1934

## PYLE ET AL. *v.* KERNAN
(36 P. (2d) 580)

*Wm. P. Lord,* of Portland, for appellant.

*Lawrence T. Harris,* of Eugene (Harris, Smith & Bryson, of Eugene, on the brief), for respondents.

BELT, J.   In July, 1929, the state highway commission called for bids on a contract to resurface 12 miles

of the Roosevelt coast highway between Riverton and Bandon, in Coos county, and to furnish 15,400 yards of broken stone for highway construction purposes. The specifications called for Tupper rock, that is, rock to be obtained from a certain quarry located near Bandon. The commission considered the bids excessive and therefore rejected them. The following month a second call for bids was made. Pursuant to this call the following bids were submitted: Guy Pyle and the Newport Construction Co., $144,802; the defendant, F. J. Kernan, $153,400; and Joplin & Elden, $155,220. Plaintiffs being the lowest bidder, the contract was awarded to them. In accordance with the rules and regulations of the commission, the plaintiffs accompanied their bid with a bond in amount equal to 5 per cent of the total amount of the bid. Within three or four days after the award was made on the 29th day of August, the plaintiffs began preliminary work and, much to their surprise and dismay, found that Tupper rock is extremely hard and that it was not practicable to crush it for highway construction purposes. Three different compressors were used to determine whether this rock could be satisfactorily crushed but none of them could do the work. A ton and a half of the rock was shipped to Portland for experimental purposes and the tests made proved that the rock could not be crushed without excessive cost. Engineers of the highway commission also made a thorough test of the rock and found that the complaint of the contractors was well founded. In this preliminary work the plaintiffs expended approximately $3,000.

Continued negotiations relative to a change of the plans and specifications—in which the plaintiffs, the defendant and the highway commission engineers participated—finally culminated in a meeting at a hotel

in Coquille, on December 6, 1929, where it was verbally agreed between the plaintiffs and the defendant that the latter would take over the contract if Umpqua river gravel were substituted for Tupper rock and that Kernan would pay $3,000 to the plaintiffs for the assignment of the award to him. Engineers of the commission who were in attendance at this meeting testified in support of the plaintiffs as to the understanding and agreement of the parties. Kernan had a dredge and other machinery at Reedsport near the mouth of the Umpqua river and was well equipped to carry out the contract if the substitution were made. Under this proposed change, the gravel would be taken from the river and shipped by train to Coquille where it would be placed on barges and carried down the Coos river to various landings and then hauled by trucks where needed. The matter was formally considered by the commission on December 12, 1929, as thus evidenced by its minutes:

"Ross Newport and Guy Pyle, the successful bidder on the Riverton-Bandon-South resurfacing projection which bids were received on August 29, 1929, stated that they had attempted by various methods to work the *rok* in the government quarry at Bandon but were unable to drill it on account of its hardness. Mr. Newport stated that they had made a thorough search for other quarries in the vicinity but had found no prospect of sufficient quantity complying with the specifications except the Norway quarry south of Coquille. The Engineer stated that he confirmed the opinion of Mr. Newport that it was *imprctical* to drill the rock in the Bandon quarry after checking the methods and equipment used by the contractors. Also the department's engineers had made an exhaustive search for suitable rock to substitute but had found no deposits in the vicinity of the project. As to the Norway quarry satisfactory rock could be secured there if the soft strata were screened out, but because of its location, a long truck haul over an improved highway would be neces-

sary which would be objectionable, particularly in the winter months. Mr. Newport stated that if gravel from the Umpqua river was accepted in lieu of rock, that he could make arrangements to assign his contract to F. J. Kernan who would do the work under the same specifications and at the same price, Kernan's plan being to dredge the gravel from the Umpqua river, load into cars at Reedsport, ship by rail to Coquille, there unload into barges, which would be towed down the river to various landings below Riverton, and there hauled out on the road in trucks. The Engineer recommended that the substitution of gravel be permitted and an assignment of the contract to Kernan be accepted. Matter taken under consideration.''

On the following day the commission approved the proposed alteration and the assignment of the award.

Plaintiffs insisted upon reducing their verbal agreement with defendant to writing before making assignment of the award. Hence the following letter of defendant to them under date of January 17, 1930:

''In confirmation of our agreement relative to the assignment by you of your right and interest in and to the award of the contract covering the re-surfacing of 12 miles of the Roosevelt Coast Highway between Riverton and Bandon in Coos county, and the furnishing of 15,400 cubic yards of broken stone for highway construction purposes, and in consideration of said assignment I hereby agree to pay you the sum of $3,000, which said sum is to be paid out of the fourth estimate of funds earned by me under said contract, provided that in the event there are not sufficient funds in the fourth estimate to permit the payment of the full amount of the said $3,000 the balance shall be paid out of the immediately succeeding estimate or estimates of money earned for work accomplished under said contract; provided further that in the event there are not four estimates then said sum shall be paid out of the final estimate.''

After receipt of the above letter, the plaintiffs made an assignment of the award and a contract for performance of the work was thereupon executed. Thereafter, in accordance with the revised plans and specifications, the construction work was completed and Kernan was paid in full for the same. The latter, however, failed and refused to pay plaintiffs for the assignment of the award. Hence this action.

The cause was submitted to the court without a jury and a judgment was rendered in favor of the plaintiffs for $3,000, together with interest thereon at 6 per cent per annum from June 30, 1930. From this judgment defendant appeals.

Defendant's motion for directed verdict is based upon three propositions which will be considered in the order stated: (1) That the agreement for assignment of the award is without consideration in that, at the time it was executed, plaintiffs had no vested rights in the contract as no bond for performance had been filed within ten days after the contract was prepared by the commission and submitted to the plaintiffs for execution; (2) That the agreement to pay the plaintiffs $3,000 is contrary to public policy in that its effect is to prevent free bidding and tends towards the stifling of competition. In regard to this contention it is urged that there was a material alteration in the contract awarded to plaintiffs and that no new contract could be made without readvertising a call for bids; (3) That the agreement in fact was that defendant was to pay $2,000 and that such was to be paid out of the profits, if any, made under the contract.

■ Section 44-130, Oregon Code 1930, provides that in all contracts for the improvement of state highways there shall be required a bond for the faithful performance of the same in an amount not less than 50 per cent

of the total amount of the bid, but no time is specified as to the filing of the contract bond. The same section also vests authority in the commission to reject bids if they are not satisfactory and to readvertise calls for bids. Under section 44-111, Oregon Code 1930, the highway commission is given authority to make such rules and regulations as it deems necessary. Pursuant to this authority, the commission adopted the following rule relative to the contract bond:

"Should the successful bidder to whom the contract is awarded fail to execute the same within ten (10) days, not including Sundays, from the date of receiving the contracts prepared and ready for execution, or fail to execute and deliver the contract and contract bond as required, or fail to commence work, or fail to satisfactorily prosecute same in accordance with the terms of the contract, such cash bond or check shall, if the Highway Commission orders, be forfeited to said State of Oregon, and, *at the option of the Highway Commission, the award may be withdrawn and the contract cancelled.*" (Italics ours.)

It is conceded that no contract bond was ever filed by the plaintiffs although more than ten days had elapsed after receipt of the contract prepared by the commission.

Did such failure to file the contract bond destroy the rights of the plaintiffs in the award? Under the above rule, the commission clearly had the right to cancel the contract, but it did not exercise its option so to do. In view of the negotiations pending relative to alteration of the plans and specifications, the commission saw fit to waive this breach on the part of the plaintiffs. The award was not withdrawn and, at the time of its assignment to the defendant, the plaintiffs still had vested rights therein. Such was in the nature of a property right. After acceptance of the bid, the successful bidder

has a clear legal right to have a contract executed. Such principle was recognized by this court in *Salem Sand and Gravel Co. v. Olcott,* 97 Or. 253 (191 P. 776). We see slight merit in the contention that the contract of assignment was not based upon a valuable consideration unless it be said that the contract is against public policy and therefore null and void: *Safety Insulated Wire & Cable Co. v. Baltimore,* 66 Fed. 140 (13 C. C. A. 375). Also, see cases cited in note 30 L. R. A. (N. S.) 130.

The second proposition of the defendant is that the contract is void as against public policy. This does not sound well coming from the defendant since the contract of which he complains—the assignment of the award—made it possible for him to do the construction work and to make a nice profit therefrom. Ordinarily a contractor who has received the benefit of a change in the plans and specifications will not be heard to complain about the validity thereof. This general rule, however, has no application, and estoppel cannot be invoked where the benefits derived are from a contract void as against public policy. The principle of estoppel by receiving benefits does not apply to prevent a defense that a contract is void as against public policy: 21 C. J. 1210. It is the policy of the law to preserve and maintain the public welfare.

Courts have refused to declare any hard and fast rule for determining whether a contract is void as against public policy. Like fraud, public policy is difficult of definition. Each case must be determined in the light of its own particular state of facts. Hence, cases not based upon a similar fact situation are not helpful. As stated in 13 C. J. 425:

"* * * The test is the evil tendency of the contract and not its actual injury to the public in a particu-

lar instance." Citing numerous authorities in support of the text.

■ The statutory requirement that the award of contracts for the "construction, improvement, repair or maintenance" of public highways be made "to the lowest and best responsible bidder upon the kind of material or materials selected by said commission" has for its purpose or object free and open competition in the letting of public improvement contracts. It is a safeguard against fraud, favoritism, and collusion: 44 C. J. 325. Any contract having a natural tendency to bring about a circumvention of the statute—by whatsoever scheme or plan—is contrary to public policy: *Terwilliger Land Co. v. City of Portland,* 62 Or. 101, (123 P. 57); *Montague-O'Reilly v. Milwaukie,* 101 Or. 478 (193 P. 824, 199 P. 605).

In the instant case there is no evidence tending to show fraud or collusion. The bidding was free and open. Plaintiffs did not sell the bid to defendant for a profit, but were to be merely reimbursed for expenditures made in the execution of the contract. It is not a case of "chilling the bids" or the stifling of competition as in *Rosenkrantz v. Barde,* 107 Or. 338 (214 P. 893), and *Newport Construction Co. v. Porter,* 118 Or. 127 (246 P. 211). There was no change in the contract price and the substituted material, in the light of the evidence, was equal in quality to that specified in the original plans and specifications. The award was made to the plaintiffs and they, with the utmost good faith, undertook to perform the contract, when it was ascertained that the crushing of Tupper rock for highway purposes was impracticable. Under such circumstances, where unforseen obstacles arose, did the highway commission have authority thus to alter its plans and specifications without readvertising a call for bids?

■ While courts should zealously maintain the right of competitive bidding on public improvement contracts, the statutory restriction relative to the award of such contracts should not be construed so as to divest the commission of all discretion in the matter of alterations or changes in plans and specifications. A reasonable degree of latitude is essential to an intelligent and efficient administration of public works. See Donnelly on the Law of Public Contracts, section 142. If the rule were otherwise, public interests would be greatly jeopardized in the event of emergencies and unforeseen obstacles in construction work.

■ In the original plans and specifications, under the heading, "Alterations in Details of Construction" is the following provision:

"The Engineer, during the progress of the work may alter any of the details of construction, including the grade or alignment of the road, or both, and may increase or decrease the quantities as may be found expedient or suitable; such alteration shall not invalidate the contract or release the sureties, and the contractor agrees to accept and execute the work as altered the same as if it had been a part of the original contract.

"Unless the alterations made by the Engineer very materially change the character of the work to be performed or the cost thereof the altered work shall be paid for at the same unit prices as other parts of the work. If, however, the character of the work and the unit cost thereof are materially changed, an allowance shall be made on such basis as may have been agreed to between the Engineer and the contractor in advance of the performance of the work, or in case no such basis has been previously agreed upon, then an allowance shall be made either for or against the contractor in such amount as the Engineer may consider to be fair and equitable.   *   *   *."

The change made by the commission—which we think was in furtherance of the public interest—was by virtue of the contract awarded to plaintiffs and assigned to the defendant. In our opinion it was not a case of making a new contract. There was no change in the materials used in the construction work. Umpqua gravel is as much rock as is the material taken from the Tupper quarry. The rule requiring substantial conformity to the plans and specifications as originally proposed should be applied with greater strictness where the right to enter the contract is challenged at the inception of the proceedings than in those cases where there has been no question of substantial conformity raised before completion of the work.

The alteration in the instant case was made under a reservation in the contract expressly providing therefor and we think it was not of such character as to require readvertisement of a call for bids: 49 C. J. 374. There was no change in the general plan of construction and the same kind of material, viz., rock, went into the construction work. If a call for bids on Umpqua gravel had been made, the State, in all probability, would have been obliged to pay a higher price for the work, since the defendant was the only person who had the equipment for furnishing gravel under such a contract. The state received the full benefit of competitive bidding and there was no attempt to evade the law: *Escambia County v. Blount Const. Co.*, 66 Fla. 129 (62 So. 650); *City of Mankato v. Barber Asphalt Paving Co.*, 142 Fed. 329. The contract in question did not have a tendency to stifle competition. It was not against public policy. None of the cases cited by appellant are based on a state of facts similar to the one under consideration. Appellant relies strongly on *Conway v. Garden City Paving Co.*, 190 Ill. 89 (60 N. E. 82), and

*Lassiter & Co. v. Taylor,* 99 Fla. 819 (128 So. 14, 69 A. L. R. 689), but we think a mere casual reading of these two cases discloses an entirely different fact situation.

The finding of the trial court is conclusive that the contract was as alleged in the complaint. The letter of the defendant absolutely refutes his contention that he was to pay only $2,000 for the assignment of the award if profit to that extent was made out of the job.

The judgment of the lower court is affirmed.

RAND, C. J., and BEAN and KELLY, JJ., concur.