Robert N. CAMERON and Jack Crawford, Appellants,

v.

VANCOUVER PLYWOOD CORPORATION, Appellee.

No. 16036.

United States Court of Appeals
Ninth Circuit.

April 24, 1959.

---

**536**

Yates, Murphy & Carlson, Roseburg, Or., for appellants.

Black, Kendall & Tremaine, George Black, Jr., Milton C. Lankton, Portland, Or., for appellee.

Before STEPHENS, HAMLEY and JERTBERG, Circuit Judges.

HAMLEY, Circuit Judge.

Plaintiffs brought this suit against Vancouver Plywood Corporation to recover damages for breach of an oral contract to log timber. The action was commenced in the Circuit Court of the State of Oregon for the County of Douglas. It was thereafter removed to the federal district court because of diversity of citizenship.

In a pretrial deposition one of the plaintiffs described the circumstances under which the contract was entered into and the terms agreed upon. Defendant interpreted this deposition as revealing that the contract was one to stifle bidding at a government sale of timber. Asserting that such a contract is contrary to public policy and therefore unenforceable, defendant moved for entry of a summary judgment dismissing the action.[1] The motion was granted, and summary judgment was entered for defendant. Plaintiffs appeal.

The timber concerned, situated in Douglas county, Oregon, was government timber on revested Oregon and California Railroad and reconveyed Coos Bay Wagon Road grant lands, commonly called "O. and C." timber.[2] These lands are managed by the Bureau of Land Management, Department of the Inter-

---

1. Pursuant to Rule 56, Federal Rules of Civil Procedure, 28 U.S.C.A.

2. See Regulations Governing the Sale of Timber on the O. & C. Lands, Bureau of Land Management, Department of the Interior, 43 C.F.R. § 115.37(d), (e).

ior, pursuant to the act of June 9, 1916, 39 Stat. 218. Section 4 of this act provides that the timber on these lands shall be sold by public competitive bidding.

Under the regulations governing such sales, the Bureau of Land Management first obtains an appraisal of the timber to be sold, and then advertises for bids. If no bid is received within the time specified in the notice of sale, the authorized officer may keep open the period for the receipt of bids for an additional ninety days. During this extended period, as soon as a bid is received at not less than the advertised minimum appraised price, it is publicly posted for a period of not less than five days. If no other offers are received during this five-day posting period, the contract may be awarded to the sole bidder, if qualified. If however, during such posting period, other offers are received, then all offers are permitted to participate in an oral auction sale.[3]

The timber in question, comprising three million feet, was appraised by the Bureau at approximately $98,000, and offered for sale on competitive bidding. No bids were received within the time specified in the notice. The officer in charge determined to extend the period of bids for ninety days, under the regulation to which reference has been made. The following account of what thereafter transpired is based exclusively upon the depositions of Crawford and Cameron.

About July 1, 1957, while the ninety-day extension period was in effect, Crawford and Cameron cruised the timber. The next day Crawford met Bill Smith, an employee of Vancouver Plywood, at the company's log pond. Crawford gave Smith the government prospectus for the sale. They talked about the price of logs and what Vancouver Plywood was paying. Smith told Crawford that the company would either let Crawford and Cameron sell the logs back to the company or would buy the timber and let appellants log it "for so much a thousand." Crawford asked if Smith was interested in the tract. Smith said that he would take his cruiser and go himself and look at it, and if he was interested he would let Crawford know.

Three or four days later Smith telephoned Crawford. He told Crawford that his cruise showed about eighteen per cent less timber than the O. and C. cruise. He asked Crawford how much he and Cameron would charge for logging the tract. Crawford quoted twenty-nine dollars a thousand feet, including the building of a required road. Smith told Crawford during this telephone conversation that he, Smith, would go down and submit a bid.

A day or two later Crawford saw Smith in the latter's office. They talked about the sale and the type of timber. Smith indicated that it was just the kind of timber the company wanted at that time. He stated that he would like to have about seventy-five thousand feet a day delivered to the company's pond. The two also talked about the road and agreed that the logging could be done before the road was constructed.

A few days later, on the Sunday afternoon immediately prior to the sale date, Crawford visited Cameron at his home and they decided to enter a bid. At this time, Crawford stated in his deposition, he knew that Smith had put in a bid. He further stated that he and Cameron decided that "we would put down a bid, too, to insure ourselves of the tract of timber in the event that they [Vancouver Plywood] didn't go ahead and buy."[4]

On July 16, 1957, Crawford went to Smith's office and told Smith that "in the event they [Vancouver Plywood] de-

---

3. 43 C.F.R. § 115.39, 42, 45.

4. Cameron stated in his deposition that at this time he did not know whether Vancouver Plywood had submitted a bid, but that he then thought that they had not. He further stated: "We discussed whether Vancouver Plywood was going to purchase the sale, and if they wasn't going to purchase this sale, that we were going to purchase it ourselves." Cameron also stated that Crawford told him on the next day, July 16, 1957, that he did not know whether Vancouver had submitted a bid.

cided not to buy the sale, that Bob [Cameron] and I had decided that we were going to buy it and that we were going to enter a bid, too. * * *" The two arranged to meet the next day, which was the date of the sale, and go together to Roseburg where the sale was to be held.

Crawford was uncertain as to when he submitted the bid on behalf of Cameron and himself. He first indicated that he put in this bid on July 17, 1957, which must have been after he and Smith reached Roseburg on that day. Later, however, he stated that he thought appellants' bid was placed on July 16, "because I am pretty sure I had stopped by Bill Smith's office on the 16th and told him that I had submitted a bid." [5]

On July 17, Crawford met Smith and the two drove the seventy-five miles to Roseburg in Smith's car. The conversation which took place during this trip, as stated in Crawford's deposition, was as follows:

"Q. Well, just tell me who said what and what was said, if you will. A. Well, I can't remember of too much being said other than that.

"Q. You say you agreed that if you and Mr. Cameron got the logging job, you would withdraw your bid on the timber, is that correct? A. Yes.

"Q. And what did Mr. Smith say to that? A. He said that would be all right.

"Q. Do you say that he agreed that you would get the job? A. Yes.

"Q. Then what, if anything else, was said? A. That is a hard thing to answer. We talked about several things but it was small talk.

"Q. Well, did you say anything more about this timber or the bidding on it or anything in connection with it? A. No.

"Q. Just what you have told me here now? A. Yes.

"Q. And just to be sure that we have it correctly and have all of it, you told Mr. Smith that if you and Mr. Cameron got the logging job, that you would withdraw your bid, and you say that he said that was agreeable, that you could have the job, is that correct? A. Yes. * * *"

At the sale, Smith first raised the Vancouver Plywood bid five cents. Crawford then withdrew the bid which he and Cameron had made. The sale was then awarded to Vancouver Plywood. After the sale, Smith agreed with Cameron and Crawford that they should begin logging in thirty days. Subsequently the company placed another logger in the timber, and this lawsuit resulted.

The theory on which the summary judgment was entered was that the contract testified to by Crawford was entered into on July 17, 1957, while Crawford and Smith were driving to Roseburg. The gist of this contract, according to this view, was that if the company would give appellants the logging job they would withdraw their bid on the timber.

█ If there is no genuine issue of fact as to the date and terms of the contract, as just stated, it was proper to enter summary judgment for appellee. Such a contract would have as a principal purpose the "chilling" of bids at an auction of public property and would therefore be illegal and unenforceable.[6] Where the pleadings and depositions

5. In appellants' brief it is stated that Crawford and Cameron placed their bid on July 15, 1957.

6. Kine v. Turner, 27 Or. 356, 41 P. 664; Rosenkrantz v. Barde, 107 Or. 338, 214 P. 893; Newport Construction Co. v. Porter, 118 Or. 127, 246 P. 211; Pyle v. Kernan, 148 Or. 666, 36 P.2d 580. This being a diversity suit, it is governed by the law of Oregon, where the transaction occurred. But in any event the Oregon rule, as stated in the above-cited cases, is in accord with the general rule. See 2 Restatement of the Law of Contracts, § 517, page 1002; 5 Williston on Contracts (Rev.Ed.), § 1663, pages 4691–4694.

show without genuine issue of fact that the contract sued upon is contrary to public policy and void, entry of summary judgment for the defendant is proper. Silverman v. Osborne Register Co., 81 U.S.App.D.C. 163, 155 F.2d 879.

But appellants argue that there is a genuine issue as to a material fact. They contend that it may reasonably be inferred from Crawford's deposition that the contract was entered into prior to July 17, 1957, and no later than July 6, 1957. The contract, according to appellants, was that in the event Vancouver Plywood purchased the timber, Crawford and Cameron would do the logging for twenty-nine dollars a thousand feet, this to include construction of the road. It is appellants' view that the conversation of July 17 did not represent the negotiation of a contract, and contained none of the elements of a contract. Crawford's statement to Smith during the July 17 ride to Roseburg, according to appellants, was intended only to reassure the latter that the bid of Crawford and Cameron was not in derogation of the prior oral logging contract.

■■ If appellants' interpretation of the transaction is correct, the contract sued upon is not illegal and unenforceable. It is a contract entered into before appellants said anything to Smith about withdrawing a bid and before they had even considered placing a bid of their own. Hence it is not a contract which contemplated the chilling of bids. Moreover, under this version, the bid placed by Crawford and Cameron was intended to be operative only if the company failed to complete the purchase and was never intended as competitive to the company's bid. Considered in this light, the assurance that the bid would be withdrawn was not given for the purpose of preventing competition and reducing the price,

and hence did not render the contract illegal and unenforceable.[7]

In our view, there is a genuine issue of fact as to when this contract was entered into and the nature of its terms. While it is alleged in the complaint that the contract was entered into on or about July 17, 1957, we do not regard this as conclusive. Appellants argue that this date was named because it was then that the company acquired the timber—a condition subsequent under appellants' interpretation of the transaction. But in any event the date of July 17 is not binding upon appellants if Crawford's deposition indicates a different date, since the complaint could be amended, if necessary, to correct such an error.

The terms of the contract on which appellants rely—the price, road construction, place of delivery, and quantities to be delivered—were not mentioned during the July 17th conversation. All of these matters were discussed and agreed upon prior to that time, according to Crawford. The explanation which Crawford gave for the placing of a bid on behalf of Cameron and himself is plausible and, as before indicated, tends to show that its withdrawal was not motivated by a desire to reduce competition or reduce the price. Under the regulations, the company was bound by its bid. Crawford's deposition indicates, however, that he did not understand this and supposed that the company could withdraw its bid.

■ In deciding whether there is a genuine issue as to any material fact, the circumstance that a particular pleading, deposition, admission, or affidavit is taken as true is not determinative. An issue of fact may arise from the countering inferences which are permissible from evidence accepted as true. As stated in Slocum v. New York Life Insurance Co., 228 U.S. 364, 388–389, 33

7. In order to render a contract illegal and unenforceable under the rule being discussed, it must be shown that a purpose of the promise to withdraw the bid was to stifle competition and reduce the price of the property to be sold. 5 Williston on Contracts, supra, page 4693; 2 Restatement, Contracts, supra, § 517, page 1002; Kine v. Turner, supra; Rosenkrantz v. Barde, supra, 214 P. at pages 896, 898.

S.Ct. 523, 533, 57 L.Ed. 879, "* * * the admission [of facts on demurrer] * * * must be of the facts, and not merely the evidence from which their existence is inferable. * * *" See, also, Guerrero v. American Hawaiian Steamshp Co., 9 Cir., 222 F.2d 238, 243.

All doubts as to the existence of a genuine issue as to a material fact must be resolved against the party moving for a summary judgment. Toebelman v. Missouri-Kansas Pipe Line Co., 3 Cir., 130 F.2d 1016. It is especially necessary to be cautious in making such a determination where, as here, a jury trial has been demanded. Cox v. English-American Underwriters, 9 Cir., 245 F.2d 330, 332, 333.

Having concluded that there is here a genuine issue as to a material fact, the judgment is reversed and the cause is remanded for further proceedings.