ALBERT RUEMMELI V., WILLIAM CRAVENS.

(Filed September 10, 1903.)

1. **LIQUOR LAWS—Contract in Violation of—Action Cannot be Main-tained Upon.** Where R who is a non-resident of the territory, enters into a contract with C, and employs C as his agent, to sell intoxicating liquors at wholesale within the territory, without the procurement of a license therefor by R, and C procures a license and conducts the business in his own name, without disclosing the agency: Held, that such contract and the sales thereunder are in violation of the liquor laws of the territory, and held, fur-ther, that where an accounting has been had between the parties, and C has failed to fully account for all the moneys and property received by him for the benefit of R, an action cannot be main-tained by R upon such contract to recover the amount which C failed to account for, and which amount it is alleged that C wrongfully embezzled and appropriated to his own use.

2. **SAME.** One who has procured a license to sell intoxicating liq-uors is thereby authorized to carry on a business for himself only and sell his own goods, but is not authorized to carry on a busi-ness for some other person, as agent or otherwise, or to sell the liquors of any other person, under said license.

(Syllabus by the Court.)

*Error from the District Court of Kay County; before Bayard T. Hainer, Trial Judge.*

*J. F. King,* for plaintiff in error.

*W. K. Moore* and *Dale & Bierer,* for defendant in error.

### STATEMENT OF FACTS.

This action was commenced in the district court of Kay county by Albert Ruemmeli, plaintiff in error, against William Cravens, defendant in error, to recover the sum of $784.55, which it was alleged had been embezzled and appropriated by the defendant while acting as the agent of the plaintiff in wholesaling beer, malt liquors and ice, in Kay county, Oklahoma.

The petition alleges the employment of the defendant as agent to sell, handle and distribute beer, ice and malt liquors, and to collect the money for the same, within Kay county, Oklahoma, at a monthly salary of $75, and necessary expenses, in handling and selling beer, ice and malt liquors. That the defendant entered upon his duties as such agent about May 1, 1896, and continued as such until May 1, 1900, at which time the defendant was discharged, and was paid in full all his salary and expenses by the plaintiff. That during the period of the agency, the defendant fraudulently misappropriated and embezzled, and converted to his own use and benefit, certain moneys collected by him in the course of his business as agent for the plaintiff, which he had received as proceeds of the goods and merchandise furnished by the plaintiff and sold by the defendant.

The petition contains a statement of some of the different items which it is claimed were unaccounted for and

embezzled. The petition also alleges certain fraudulent over-charges, of which the plaintiff had no knowledge at the time of the settlement.

At the time of the commencement of this suit, there was an order of attachment issued, and certain property levied upon.

The answer filed by the defendant denied the allegations of fraud and embezzlement, as well as the indebtedness, and admitted the agency and the sale of the beer, ice and malt liquors. The answer further shows that the agreement of agency for the sale of the liquors was made within the Territory of Oklahoma. That the defendant was employed by the plaintiff at a regular stipulated salary to act as agent, manager and solicitor of said plaintiff, to sell, dispose of and control the sale of beer, beer products, and malt liquors of the Pabst Brewing Company, and pursuant to said agreement this defendant did during the aforesaid period, from the first of May, 1896, to the first of May, 1900, sell the same at wholesale for said plaintiff, in said counties of Kay, Pawnee and Payne. That the same was sold by this defendant under said contract for the exclusive use and benefit of said plaintiff, and this defendant did not share in any of the profits arising from the sale of said goods for the said plaintiff.

The answer further showed that all of said sales, during all of said time, were made for and on behalf of the said plaintiff, and that the said plaintiff, during all of said time from the first day of May, 1896, to the first day of May, 1900, was not authorized to conduct business in wholesaling malt, spirituous and vinous liquors at or within either of said counties, in said territory, and that said goods so furn-

ished by the plaintiff were furnished, and all of said sales were made, with the full knowledge of the fact that said plaintiff had no license to conduct the business of whole-saling malt, spirituous and vinous liquors in said counties of Kay and Pawnee, and that all of the sales, contracts, agreements and arrangements for goods furnished by the plaintiff, and by said plaintiff distributed' through its agent in said counties of Kay and Pawnee, during the time from the first day of May, 1896, to the first day of May, 1900, were illegal and void, and against public policy, and that the plaintiff was not authorized to conduct the business of wholesaling malt, spirituous and vinous liquors, and that the items sued for were items for the collection of moneys secured for beer sold by the plaintiff during the time from May 1, 1896 to May 1, 1900.

A motion to dissolve the attachment was made, decision upon which was withheld until after judgment was rendered. The pleadings contain other allegations, which are not deemed necessary to be shown here.

The cause being called for trial and a jury empaneled, Mr. J. F. King, attorney for plaintiff, made the following statement to the jury:

"May it please the court.    Gentlemen of the jury.    We expect in this case the evidence will show the following facts: That during the years 1896, 1897, 1898, 1899 and 1900, during all the times covered by plaintiff's petition in this case, the plaintiff, Albert Ruemmeli, is and was, and ever since has been, a resident of the city of Saint Louis, in the state of Missouri, and that during none of these times has he been a resident of the Territory of Oklahoma; that he was engaged in the sale of malt liquors throughout the country generally; that he was engaged in handling the Pabst product

over a certain territory and desiring to establish agencies, he made and entered into an agreement some time in the early part of the year 1896 with the defendant in this case, William Cravens, by which William Cravens was to secure a license in his name—that is, in William Cravens' name—in this, Kay county, Oklahoma Territory, and possibly some other counties in this territory. That Mr. Ruemmeli was to furnish Mr. Cravens beer and ice, and that Mr. Cravens was to sell the beer and ice to retail dealers in this county who were lawfully licensed to sell the same. That Mr. Cravens was to have the entire charge, management and control of that business, was to look after it, and that he was to exercise his discretion in his position according to the laws of the Territory of Oklahoma, and sell it according to the laws of the Territory of Oklahoma, and in all manner conduct his business subject to the laws of the Territory of Oklahoma; that this place of business was established at Ponca City, Oklahoma; and that this beer and ice, and beer particularly, was to be furnished upon orders either in carload lots, or in certain packages from the brewery in Milwaukee, Wisconsin. That Mr. Ruemmeli was to pay Mr. Cravens the sum of $75.00 per month, that he was to pay to him for his services in that business the sum of $75 and his reasonable and rightful expenses incurred in the conduct of that business. Mr. Cravens during all this time—that is, during all the times I have mentioned—secured territorial licenses authorizing him to sell and dispose of malt, spirituous and other liquors under the liquor license law in and through Kay county, Oklahoma Territory, and possibly other counties, and he at all times held these licenses. That Mr. Cravens entered upon his duties as agent in the sale of this beer and ice. That that business was conducted by Mr. Cravens in his own name, using his own letter heads, managed by Mr. Ruemmeli in no way whatever except to receive his accounts from him and his money. That business was conducted by Mr. Cravens up to the first day of May, 1900, and he sold quite an amount, I believe

$7,000.00, of this beer and ice in this county to the retail dealers of the county and possibly ice to outside parties. That, at a settlement between these parties—one of the settlements—I believe about the first day of May, 1900, that the books which Mr. Cravens kept showing his transactions were submitted to the representative of Mr. Ruemmeli. That he represented to Mr. Ruemmeli through his agent that these books contained a true and correct statement of the business which he had done in this county; and that among other things he had charged up as claim against Mr. Ruemmeli, one of $50.00 about May 1, 1900, and that originated in the fact that he took $50.00 of this money that had been collected, and invested in a lot—it may be the evidence will show that was by consent of Mr. Ruemmeli—but it was to be held by him in trust; and about the 15th day of July he took $50 of this money and paid it on the balance of that lot; that on June 2, 1899, he paid for the building in part—paid for the lumber that went into the building located upon that lot that stood in the name of William Cravens; that he paid $7.00 on June 5th, or about that time, and he paid $7.50 and $7.85 for some other material which went into the building; and that Mr. Cravens appropriated that lot to himself. He sold the lot afterwards and put the money into his pocket and has never accounted to Mr. Ruemmeli for it, and refuses to account with us for it. That before March first, 1900, in the due course of his proceedings he sold beer and ice to a man running a saloon at Kildare, named Woods, to the amount of $150, and the amount of the claim, together with interest up to March first, 1900, amounted to $180.00. That Mr. Woods gave Mr. Cravens a bill of sale, which was in effect a mortgage, securing his claim for this beer and ice sold by Mr. Cravens to Mr. William Woods, and Mr. Cravens accepted the bill of sale as his security, together with a number of other claims which he had also secured; that this claim was paid off by Mr. Woods' estate, he having died; that Mr. Cravens executed a bill of sale back to the estate of William

Woods and released this claim entirely; that Mr. Cravens has failed and refused to account to Mr. Ruemmeli for this $180 and has kept the proceeds ever since. That between May 1, 1896, and May 1, 1900, Mr. Cravens took out of the business and out of the money the sum of about $148.85, and that he has refused to account for this item, and the same is due from him to the plaintiff. That he charged up on these books an unreasonable amount of expense; that the sums so overcharged amounted to $20.00 per month more than what was reasonable and right; that he deducted the twenty dollars per month out of these sales of beer and ice; that he deducted this $20.00 per month out of the proceeds of these sales for this material, and refused to account to Mr. Ruemmeli for them, and that it is now due and owing to us. On about May 22, 1900, there was paid to him a claim which was due Mr. Ruemmeli for the sale of beer and ice in the sum of $20.00, which was paid by Mr. Lynch, and that was money he obtained in the course of that business, and refused to account to Mr. Ruemmeli for it. And also the sum of $12.50 which was for feed that Mr. Cravens purchased with the money of Mr. Ruemmeli, and instead of turning it over to the establishment, he took it to his own use.

"The testimony will further develop the fact that Mr. Braun, here representing Mr. Ruemmeli, had a settlement with Mr. Cravens, or an attempted settlement, some time along about the first of May, 1900; that these items which I have mentioned were charged upon the books—not being proper items to be charged—they were charged up to Mr. Ruemmeli, and claimed by Mr. Cravens, except this $180, which appeared as a legal and unpaid account upon the books; that Mr. Cravens represented to Mr. Braun that these books contained a true and correct statement of the accounts between himself and Mr. Ruemmeli, and that the charges made upon that book were a true and correct statement of the charges, and that he was entitled to the same, and in that settlement

he was allowed to retain out of the proceeds of those sales the amount of those items I have mentioned to you, and it was found upon a balance of this account there was something like two. to four dollars due to Mr. Cravens, and that was paid to Mr. Cravens. That at the time of this settlement, Mr. Braun accepted the statement of Mr. Cravens that his book contained a true and correct statement of the account between them, and that he was entitled to the balance shown by the books; that Mr. Braun relied upon that; he did not know of those individual items at the time of the settlement; he did not know that this $100 had been appropriated to the purchase of this lot, and that the lot had been deeded away and the proceeds turned over to Mr. Cravens and kept by himself. Neither did Mr. Ruemmeli nor his agents know this house had been built on this place and paid for by the money of Mr. Ruemmeli, and that Mr. Cravens had also appropriated that to his own use. Mr. Ruemmeli did not know, nor did his agents know, other than Cravens, that this account due from the estate of Mr. Woods had been paid, and that Mr. Cravens owed this account to Mr. Ruemmeli. Neither did he know that this $148.85, or something thereabouts, charged to profit and loss, had been money collected by Mr. Cravens, and that he should have accounted for it; and so with this $20 per month expense account. In that settlement it was represented that these items were just and reasonable, and they took the books for it. Having shown you this state of facts, if the testimony develops that condition of affairs, we will expect a verdict at your hands for the sum of $784.55.

"Now I will read, if your honor please, this agreed statement of fact in reference to the license. We have agreed to it in writing. In this connection we have made the following agreement: (Counsel here reads paper to the jury·as follows.)

" 'It is agreed by both parties hereto as facts in this case that from May 1, 1896, to May 1, 1900, neither Albert

Ruemmeli, the plaintiff, nor the Pabst Brewing Company, had any license to sell beer, malt, spirituous or vinous liquors at wholesale or retail in Kay county, O. T.

"'It is further agreed that from May 1, 1896, to May 1, 1900, William Cravens had a license in his own name to sell beer, malt liquors and cigars at wholesale in Kay county, O. T. That these facts with reference to the license were known by both parties at all times from May 1, 1896, to May 1, 1900. This agreement is not intended to refer to the United States government license under the revised statutes.'"

At the conclusion of the statement to the jury by counsel for plaintiff, the defendant objected to the introduction of any evidence, and moved the court to take the case from the jury and render judgment for the defendant upon the pleadings and the facts set forth in the opening statement of counsel for the plaintiff, for the reason that the pleadings and the facts as stated by counsel show that the plaintiff is not entitled to recover from the defendant, and that the plaintiff is not entitled to maintain this action. This motion was sustained by the court, and an exception was duly saved. Thereupon the court rendered judgment for the defendant for costs, and dissolving the attachment, and ordering the attached property restored to the defendant.

Opinion of the court by

PANCOAST, J.: While the foregoing statement of facts is quite lengthy. but one issue is raised, and one question only is necessary to be passed upon by this court. The defense below sought to defeat the action upon the ground that the contract entered into was an illegal one and against public policy, for the reason that the plaintiff had not procured a

license, and was therefore not authorized to sell malt, spirituous and vinous liquors at wholesale within the Territory of Oklahoma.

On the other hand it is claimed by the defendant in error that the contract was neither illegal nor against public policy. That inasmuch as a license was procured by the agent, Cravens, and the business was transacted in his name, the laws of the territory with reference to selling intoxicating liquors at wholesale were, in effect, complied with, and that therefore the contract was neither illegal nor immoral.

Sec. 1 of the liquor law of the territory, Wilson's Revised Statutes, page 841, provides that before a person may sell intoxicating liquors he shall first present an application by petition signed by thirty resident taxpayers, and procure a license. This section also provides that the petition for a license shall set forth that the applicant is a man of respectable character and standing, and a resident of this territory, and praying that a license may be issued to him.

Sec. 8 of the act provides that all persons selling liquors at wholesale shall be subjected to all the provisions of the act, except that they shall only be required to pay a license fee of one hundred dollars per annum, or where the license is for the wholesaling of malt exclusively, shall only be required to pay a license of twenty-five dollars annually.

Sec. 7 of the act provides that anyone receiving a license to sell liquor shall give a bond in the penal sum of $2,000.00, conditioned that he will not violate any of the provisions of the act, and that he will pay all damages, fines, penalties and forfeitures which may be adjudged against him under the provisions of the act.

In the following sections there are many provisions re-stricting the sales of liquor, and many sections prohibiting sales to certain persons, and providing for the recovery of damages in cases of violation, and also providing for punishment by fine and imprisonment in case of a violation of the law by selling without a license, and in cases of violations of the law in other respects as therein provided.

The very nature of the business of selling intoxicating liquors necessitates stringent provisions to keep it within proper channels.

How can it be said that a license obtained by Cravens, which allowed him to sell liquor at wholesale, could be used by any other person? First it is shown by the statement of counsel to the jury, which statement is here treated as facts of the case, or evidence adduced, that the plaintiff in this case was a non-resident of the territory, and this fact alone made it impossible for him to procure a license to sell liquors within the territory, either at wholesale or retail. Not one of the provisions of the liquor law was complied with by reason of the license procured by the defendant. No bond was given upon which a recovery could have been had in case of violation of any of the provisions of the act. The bond given by the defendant could only be held for violations of the law that he might be guilty of, and in no way whatever could a suit be brought upon the bond of the defendant to recover for violations of the law or injury caused by or through the acts of the plaintiff. It would seem that the contract was entered into for the very purpose of violating the liquor laws; that the agreement was that the defendant should transact the business in his own name in order that the true conditions

and facts might be kept from the public, and that it might appear upon the surface that Cravens was the principal, wholesaling liquors in his own name, instead of being simply an agent of one who, under the law, could not procure a license, and could not transact the business within the territory.

It is unnecessary to enter into a discussion of the advisability of this law, its necessity, or the wholesomeness of it. It is only necessary to know that it is a law of the territory, and that a violation of it is punishable by fine and imprisonment. The business, then, conducted by the plaintiff and defendant, in wholesaling liquor in the territory without a license, was not only against public policy, but was prohibited by the laws of the territory.

The contract, therefore, which is the basis of this action, is founded upon, and arises out of a transaction prohibited by statute. All contracts which are in violation of law are illegal, and no action or suit will lie to enforce them. And it is immaterial whether the contract is directly prohibited, or arises collaterally out of transactions prohibited by statute. Nor is it material whether there is in fact any corrupt intention on the part of either of the contracting parties to violate the law. Courts are instituted to carry into effect the laws of the country, and they cannot become auxiliary to the consummation of violations of the law. There can be no civil right where there can be no legal remedy, and there can be no legal remedy for that which is in itself illegal. And this is true as well of contracts *malum in se* as of contracts *malum prohibitum,* for the rule is extended to such as are calculated to affect the general interests and policy

23—Vol 13

of the country. (*Kelly v. Courter et al.*, 1st Okla. 277; *Garst v. Love & Word*, 6 Okla. 46.)

To enumerate here all the instances of cases in which this reasoning has been practically applied, would be simply a useless parade. But it is strenuously contended that this case does not fall within the principles laid down here, because the agent transacted the business in his own name, made the contracts for payment to himself, secured a license for himself, and the plaintiff was not to be, and was not, known to the customers to whom the sales were made, or to the general public. This requires a discussion of the rule which has been laid down by some of the courts, that when money or property has been delivered by a principal to an agent for an illegal purpose, or for the purpose of carrying into execution an illegal contract, the agent cannot set up such illegal contract to prevent a recovery by the principal from the agent of such money or property so long as it remains in his hands. (American and English Encyclopedia of Law [2 ed.], page 1009, and cases there cited.)

This rule, however, only applies in one class of cases. It must be a case in which the illegal transaction or act has been entirely completed or consummated, and the property or money, the proceeds of the illegal act or transaction, remains in the hands of the agent, and the test whether the demand connected with the illegal act can be enforced, is whether the plaintiff requires any aid from the illegal transaction to establish his case. (*Floyd v. Patterson*, 13 Am. St. Rep. 787; *Gilliam v. Brown*, 43 Miss. 641; *Simpson v. Blass*, 2 Taunt 246; *Roby v. West*, 4 N. H. 290.)

This rule as stated by the supreme court of the United States in *Planters' Bank v. Union Bank*, 16 Wall. 483, is that

while no action could be maintained upon the illegal contract:

"But when the illegal transaction has been consummated; when no court has been called upon to give aid to it; when the proceeds of the sale have been actually received, and received in that which the law recognizes as having had value; and when they have been carried to the credit of the plaintiffs, the case is different. The court is there not asked to enforce an illegal contract. The plaintiffs do not require the aid of any illegal transaction to establish their case. It is enough that the defendants have in hand a thing of value that belongs to them. Some of the authorities show that, though an illegal contract will not be executed, yet, when it has been executed by the parties themselves, and the illegal object of it has been accomplished, the money or thing which was the price of it may be a legal consideration between the parties for a promise, express or implied, and the court will not unravel the transaction to discover its origin."

It is plain to be seen that the present case does not fall within this rule. The plaintiff cannot recover in this case without the aid of the illegal transaction. This action is in the nature of an accounting between the plaintiff and defendant. Allegations of fraud, embezzlement, and bad faith generally, are made against the defendant, and the court, in order to arrive at the fact of whether or not there is any money in the hands of the defendant, as agent of the plaintiff, unaccounted for, must investigate the entire transaction. This the court will not do, but will leave the parties where it finds them. To do otherwise, courts would become auxiliary to the consummation of violations of the law. (*Leonard v. Poole*, 11 Am. St. Rep. 667.)

Another rule which meets the plaintiff here face to face,

and which cannot be overcome, is that where an agent trans-acts an illegal business, without disclosing the fact of his agency, and the money is paid to him in his own right, and not as an intermediary or agent, he cannot be compelled to account therefor to his principal, for the reason that the principal cannot show his title to the property except through the illegal contract. (*Wooten v. Miller,* 7 Smed. & M. [Miss.] 380; *Maybin v. Coulon,* 4 Dall. [Pa.] 298; *Floyd v. Patterson,* 72 Tex. 202.)

Having fully examined the entire record, and seeing no error therein, the judgment of the court below will be affirmed.

Hainer, J., who presided in the court below, not sitting; Irwin, J., dissenting; Gillette, J., absent; all the other Justices concurring.