Argued February 5, modified April 16, 1929.

# N. L. SMITH *v.* MATTIE M. BARNES.

(276 Pac. 1086.)

For appellant there was a brief over the names of *Messrs. Veazie & Veazie* and *Messrs. McCamant &*

*Thompson,* with oral arguments by *Mr. John F. Logan, Mr. W. Lair Thompson* and *Mr. J. C. Veazie.*

For respondent there was a brief over the name of *Messrs. Clark, Skulason & Clark,* with oral arguments by *Mr. A. E. Clark* and *Mr. John A. Beckwith.*

ROSSMAN, J.—The testimony and exhibits are quite extensive; we have read and examined all of the evidence with care; due to the voluminous condition of the record we deem it inadvisable to set forth our review of it. We shall, therefore, confine ourselves to a statement of our findings. In the year 1918 the plaintiff came to Portland, and shortly thereafter became engaged in the venture of unlawfully selling intoxicating liquors. In the year 1919 he met the defendant's daughter and the two became interested in one another; at about the same time she became an intermittent volunteer helper in his illegal business. A few months later the plaintiff became acquainted with the defendant and shortly thereafter the latter rented to him the family garage as a distributing place and storehouse for his liquors. At these times the plaintiff was residing in an apartment house, but was being urged by his landlord to vacate his apartment. Coincidently he concluded that a location for his business nearer to the business center of the city would be desirable. Shortly thereafter he discovered a property for sale which seemed to meet all of his requirements; it is referred to as the 11th Street property; its price was $16,500. At the plaintiff's request the defendant instituted, in her name, negotiations for its purchase, and still later concluded the purchase. The price was paid as follows: $5,000 cash, and $6,000 by conveying to the owner a

home owned by the defendant; the balance of $5,500 was taken care of by the execution of a note and mortgage, which was later discharged by payment. Apart from agreeing that the defendant applied her home toward the defrayment of $6,000 of the purchase price in the above manner, the parties are at variance as to how the balance of the purchase money was taken care of. The plaintiff testified he supplied the initial payment of $5,000 and also furnished $3,250 towards the discharge of the mortgage; he added that the defendant took care of the remaining $2,250; the defendant contends that she paid the entire purchase price. After a careful consideration of the evidence we have concluded that the plaintiff's explanation is sustained by the evidence.

■ There exists in the evidence a controversy as to the reason for the purchase of this property. It seems clear that the plaintiff discovered this place, brought it to the defendant's attention, and aroused her interest in it. The plaintiff contends that it was purchased primarily as an investment, but admits that its convenient location for the illegal sale of liquor was a strong factor. The defendant insists that the latter reason was the sole one. Even in the absence of fondly-sought judgments and decrees, which always supply powerful motives for exaggeration and coloring of testimony, it is often difficult to analyze another's mind and determine which of several reasons exerted the greatest influence in persuading him to a certain line of action. Cognizant as we are of this difficulty, we are of the opinion that the plaintiff's desire for a near-in location aroused his interest in this property and was a strong inducement in persuading him to its purchase, but that it was not the sole consideration; we believe that the

position of this property in the path of rising values, together with its attractive price, exerted a strong influence upon his mind. A circumstance, which we feel justifies the latter portion of our conclusion is the fact that a year later he purchased another expensive property purely as an investment.

Immediately following the conveyance to the defendant the parties took possession. They effected an arrangement between themselves whereby the defendant offered its rooms for rent and retained as her profit all of the income above the amounts she paid for taxes and insurance. The plaintiff occupied a small space in the basement for his liquor stores; for this he paid $50 a month rent.

■ It seems desirable at this place to determine the defendant's connection with the aforementioned liquor selling venture. She contends that she was a partner in it; this the plaintiff insistently denies. There is evidence in support of the defendant's version; for instance she testified that she made many trips with the plaintiff to distant parts, bringing back quantities of liquor to replenish the Portland stock. She also testified to many alleged instances when she and her daughter delivered liquor to customers. There is other testimony in support of her contention. The plaintiff admitted that the defendant accompanied him upon one trip to the Olympic Peninsula when they brought back a quantity of liquor; he also testified that upon a few occasions when the defendant and her daughter came down town in his automobile they brought to him small quantities of his wares as acts of courtesy, so that he might make deliveries to customers who had telephoned orders during his absence. It seems to us that the defendant has taken a few of these minor instances, with

which she was connected as a volunteer, and grossly multiplied their number for the purpose of making it seem that she was a partner. Since the defendant performed no useful service upon the trip to the Olympic Peninsula, the inference is possibly justified that she participated in it with no expectation of a financial reward but for the sake of the adventure incident to such an unlawful enterprise. Furnishing motives, perhaps for the defendant's occasional solicitous attention to the plaintiff's affairs we have the following circumstances: he was paying her $5 per day for her trouble in answering his telephone calls; it also appears that he permitted the daughter to use his automobile at her pleasure, and kept her supplied with spending money; in fact the evidence justifies the finding that he and the latter were engaged to become married; there is also the circumstance, previously mentioned, that the plaintiff was regularly paying $50 a month for the space he occupied in the 11th Street house, which apparently was ample as rent, considering the fact that he paid one-half of the purchase price of the premises. These propositions the defendant does not admit, but we believe that the evidence supplies them. They warrant the conclusion that the plaintiff was somewhat liberal with the defendant and her daughter, and that whatever interest they displayed in facilitating his ill-chosen business was due to that fact and not to any proprietary interest. We conclude that the defendant was not a partner in the liquor business.

■ In the above instances, which we have just disposed of, as in many others, the defendant's brief asks us to accept her testimony in preference to the plaintiff's. We are somewhat astonished that any woman, who requests a court to extend to her testi-

mony credit superior to that of another, whom she denounces as a bootlegger and criminal, would insistently contend that she, herself, was an active partner in that criminal enterprise and seem to fondly seek the resulting stigma which all others sought to protect her against. To us it seems that this conduct upon her part places the two upon the same testimonial level.

■ We come now to the contentions in regard to the purchase of the 12th Street property. The plaintiff admits that the defendant conducted these negotiations without anyone, except the defendant, her daughter and himself being aware of his alleged interest; he contends that the $11,000 which paid the purchase price of this property was his money which he handed to the defendant for that express purpose. The defendant admits that she received all of this money from him at the time of purchase, but insisted that it represented a part of her share of the profits of the liquor business. We have already stated that in our opinion the defendant owned no interest in that business. It may now be pertinent to observe that if her contentions of an ownership of a one-half interest in that business are advanced in good faith, it would seem strange that she would permit approximately three years' time to pass and $11,000 or more to accumulate in her associate's clandestine possession before requesting a division, and without ever asking for a statement of the condition of the business. We conclude that the plaintiff's money paid for this property. Almost immediately upon its purchase the defendant and the plaintiff effected an arrangement concerning its occupancy and use similar to that in effect in regard to the 11th Street property; that is, the defendant was put in charge and

was permitted to keep all profits derived from the rental of rooms after payment of taxes and insurance. The defendant denies that any such agreement was even mentioned.

It seems clear that all of the money used by the plaintiff in paying the purchase price of the 12th Street property and one-half of the price of the 11th Street property was money earned by him unlawfully in the sale of liquor. As we have mentioned before the plaintiff conducted his liquor transactions from the 11th Street property; he received his telephone calls there, and occupied a small basement room as a stockroom. But the 12th Street property was never used for any such purpose.

As is apparent from the pleadings the title to both properties was conveyed to the defendant; she contends as owner, while the plaintiff says her ownership was limited to a one-half interest in the 11th Street property. The plaintiff testified that when each property was purchased, it was thought best to take the title in defendant's name because of the nature of his business. He thus explained his reason, "I told her (referring to the daughter), that I was in a hazardous business, and that I might be safer if I had it in some one else's name." He added that the defendant assured him that she would convey title to him at any time he made the request. The plaintiff did not specify what hazards persuaded him to that course, nor did he particularize further than is implied by the answer above quoted. But his general course of action, while engaged in the sale of liquor, would seem to indicate that he was beset with fears which satisfied him of the desirability of concealing his financial worth. For instance, he kept but a small bank balance; most of his funds he con-

cealed in safe deposit boxes, and in addition carried large sums in his pockets. Likewise he refused to accept checks, preferring cash. We assume that he was unable to assure himself against the various vicissitudes which his guilty conscience conjured up as possibly awaiting him at some future moment, and that, therefore, prudence dictated that title should be vested in a third party, and that his ill-begotten coins should be concealed in safety deposit boxes.

June 1, 1923, the plaintiff quit the liquor business, and a year later the daughter, then thirty-one years of age, died. Shortly thereafter the relationship between the plaintiff and the defendant, having become somewhat strained, he requested a conveyance to himself of a half-interest in the 11th Street property and the entire fee in the 12th Street property; his request was accompanied with appropriate deeds for signature. When the defendant declined to execute these documents, this suit was instituted.

■ In arriving at the above conclusions upon the issues of fact we have not been unmindful of the rule that proof of a constructive or resulting trust must be clear and possess a high degree of cogency: *Snider* v. *Johnson,* 25 Or. 328 (35 Pac. 846); *Orr* v. *Orr,* 75 Or. 137 (144 Pac. 953, 146 Pac. 964).

■ Having made the above disposition of the issues of fact, we now proceed to a consideration of the various propositions of law urged by the defendant to stay the hand of a court of equity in meting out to a purchaser relief against one who withholds his property. The general maxim applicable to the situation is that one who has committed iniquity shall not have equity. More specifically stated this ancient maxim has been thus expressed: "He that hath

engaged in a fraudulent enterprise cannot complain that his associate in fraud has not kept the faith. * * A court of justice does not sit for the promotion of fraud or illegality. It is no part of its function to aid any party to a fraudulent or illegal scheme in carrying it out, in adjusting its accounts, or in dividing its spoils.'' Judge Noyes in *Primeau* v. *Granfield*, 193 Fed. 911. But this does not mean that a court of equity will first appraise the moral worth of each suitor, and if it finds that in the past he has committed some act of iniquity refuse to listen to his complaint; to repel his suit the iniquitous conduct must be attached to the particular matter in respect to which judicial redress is sought: *Liverpool & London & Globe Ins. Co.* v. *Clernie*, 88 Fed. 160. Nor does the above maxim imply that a wrongdoer is the prey of any spoliator who may outwit him; it does not embrace any proposition that because in a transaction that is now closed, an interloper may withhold the property from him: *McDonald* v. *Lund*, 13 Wash. 412 (43 Pac. 348); *Planters' Bank* v. *Union Bank*, 16 Wall. (U. S.) 483 (21 L. Ed. 473).

The defendant submits the following cases as authority for the proposition that property acquired for an illegal purpose becomes part of the illegal transaction, and that a chancellor will leave the participants in the illegal transaction where they have placed themselves: *Page-Dressler Co.* v. *Meader*, 118 Or. 359 (244 Pac. 308); *Rosenkrantz* v. *Barde*, 107 Or. 338 (214 Pac. 893); *Reid* v. *Multnomah Co.*, 100 Or. 310 (196 Pac. 394); *Horseman* v. *Horseman*, 43 Or. 83 (72 Pac. 698); *Fay* v. *Lambourne*, 124 App. Div. 245 (108 N. Y. Supp. 874); *Baker* v. *Couch*, 74 Colo. 380 (221 Pac. 1089); *Baker* v. *Sockwell*, 80 Colo. 309 (251 Pac. 543); *Horback* v. *Coyle*, 2 Fed. (2d) 702;

*United States* v. *Calbreath,* 8 Fed. (2d) 360, and
*Ruemmeli* v. *Cravens,* 13 Okl. 342 (74 Pac. 908). In
*Page-Dressler Co.* v. *Meader, supra,* the illegal trans-
action consisted of the sale of an apartment house at
an inflated fictitious value in fulfillment of a con-
spiracy so to do. The victim of the fraud had placed
the purchase money in escrow pending completion of
some details of the sale. The plaintiff, which alleged
itself to be a partner in the fraudulent enterprise,
prayed for a decree establishing its interest together
with an injunction to enjoin distribution of the pur-
chase money, and an accounting. The prayer was
denied. In *Rosenkrantz* v. *Barde, supra,* the plain-
tiffs and defendant entered into a contract to stifle
bidding upon a government contract; the defendant
was awarded the contract and apparently made a
profit. The plaintiffs instituted this suit for an ac-
counting. This court held that since they must rely
upon an illegal contract to obtain a recovery equity
cannot grant relief. In *Reid* v. *Multnomah County,
supra,* the plaintiff brought a suit to cancel an assess-
ment, a tax, and to remove a cloud upon the title of
some property. Before the assessment was levied the
plaintiff made a return that he possessed $450 per-
sonal property subject to taxation; the assessor
charged him with the ownership of $81,390 taxable
personal property; he now claims that the amount
should be $28,950. The discrepancy was due largely
to some notes which the plaintiff first secreted, and
then falsely represented as canceled. In answer to
his plea for a cancellation of the tax the decision
stated: ''It was plaintiff's wrongful conduct in the
matter of the assessment involved in this litigation
that caused the title to the lots to be clouded. He
now seeks a court of equity to remove a cloud which

his own act has cast upon his title.'' Succinctly stated he wanted this court to undo his fraud and extricate him from the embarrassing position created by his own wrong. This the court declined to do. In *Horseman* v. *Horseman, supra,* the plaintiff was possessed of a contract by the terms of which the defendants as entryman of a homestead, agreed to convey it to the plaintiff; the plaintiff sought a decree enforcing that contract. When it appeared that such a contract was opposed to the spirit and policy of the law this court held it could grant no relief. In *Fay* v. *Lambourne,* 124 App. Div. 245 (108 N. Y. Supp. 874), the plaintiffs had devised and successfully operated a form of public entertainment based largely upon deception of the audience; the defendants were former employees who had learned the plaintiff's secrets and methods and were now going about giving similar performances. In many instances their advertisements induced the belief that they were the plaintiffs; the latter sought by their suit relief against that condition. It was held that they were entitled to none. Here there was no contractual relations between the parties; the case involved, perhaps, supervision of unfair competition. But since no one can be entitled to any proprietary interest in deception, the plaintiff's suit was rejected. In *Baker* v. *Couch, supra,* we have another instance of a plaintiff who asked a court to undo his own wrong. He had transferred to a fair charmer thirty-five promissory notes upon her promise to maintain meretricious relations with him. The relief demanded would have amounted to a winding up of this immoral partnership and a return to the plaintiff of his consideration. The result was similar to that in *Reid* v. *Multnomah Co. Baker* v. *Sockwell, supra,* is the second chapter of

*Baker* v. *Couch.* The effect of the latter case was to leave the promissory notes in the possession of the paramour. She now made the mistake of assuming that the court, which had declined to sully its hands by adjusting the aforementioned affair of the flesh would place value in the notes by giving her a judgment against the maker. The relief sought was denied. In *Horbach* v. *Coyle, supra,* the directors of a corporation agreed in consideration of a secret bonus to practice deception upon the general stockholders by causing a transfer of a majority of the stock of the stockholder of another corporation and electing the officers of the latter directors of the first; thereby the second corporation would accomplish its purpose of gaining control of the refinery of the first. The court declined to enforce this contract. In *United States* v. *Calbreath, supra,* the defendant was an unofficial helper to a federal prohibition agent. He solicited and received $300 from the petitioner to prevent the latter's arrest for selling intoxicating liquors. Both petitioner and the defendant were arrested; the money was taken from the defendant by the arresting officer at the time of the arrest; the defendant was convicted of extortion, and the petitioner sought the return of the $300. Since the plaintiff was compelled to rely upon this illegal transaction in order to establish the transfer of his money to the defendant, the court expressed itself as ''of course unthinkable'' that the money could be returned. In *Rummeli* v. *Cravens, supra,* the parties effected a partnership for the illegal sale of liquors; the plaintiff filed suit for an accounting, and an award of his share of the profits; relief was denied.

In all of these cases, with the exception of *Reid* v. *Multnomah County* and *Baker* v. *Couch,* the wrong-

doers had not yet divided the spoils of their illegal transactions, and to obtain a division of the booty, by an accounting, replevin, judgment or injunction, was the purpose of the various suits. Relief was denied, not on account of the merits of the defendant, but because granting the plaintiff's prayer would encourage and exploit transactions which public policy demanded should be suppressed. In the other two cases, just mentioned, the plaintiff did not desire enforcement; the illegal transactions had already been fulfilled, but their results were disappointing to the plaintiff: he, therefore, asked to be relieved from the burden cast upon him by his own transgressions; but his sullied hands were impotent to open the door leading to the chancellor. Before proceeding further with a consideration of these cases we shall mention several more cited by the plaintiff: *Dunton* v. *Dunton,* 123 Me. 243 (122 Atl. 629); *McMullen* v. *Hoffman,* 174 U. S. 640 (43 L. Ed. 1117, 19 Sup. Ct. Rep. 839); *Leonard* v. *Poole,* 114 N. Y. 371 (21 N. E. 707, 11 Am. St. Rep. 667, 4 L. R. A. 728); *Semenowich* v. *Melnyk,* 93 N. J. Eq. 615 (117 Atl. 832); *Sewell* v. *Sewell,* 109 Wash. 252 (186 Pac. 289); *Caines* v. *Sawyer,* 248 Mass. 368 (143 N. E. 326); *Pollock* v. *Pollock,* 223 Mass. 382 (111 N. E. 963); *Rosenbaum* v. *Huebner,* 277 Ill. 360 (115 N. E. 558); *Brady* v. *Huber,* 197 Ill. 291 (64 N. E. 264, 90 Am. St. Rep. 161). The foregoing cases are cited as supporting the proposition that equity will not impress a trust upon realty into which fraudulently acquired money is invested, nor enforce claims springing from fraudulent contracts.

In *Dunton* v. *Dunton, supra,* a wife sued her husband to recover a large sum of money paid to the latter by a wealthy admirer. It appeared that either

the husband and wife had conspired to extort this money from the admirer by blackmail, or that the money was justly due the husband on account of wrongs committed against the conjugal status by the former. It was held that in either instance the plaintiff was entitled to no relief. *McMullen* v. *Hoffman* was based upon an agreement between plaintiff and defendant to stifle competition upon a municipal contract; its facts are analogous to those in *Rosenkrantz* v. *Barde, supra.* In *Leonard* v. *Poole, supra,* several produce dealers entered into a contract which represented a scheme or plot to advance the price of lard. Under it the parties bought and sold futures and options in lard, and in other manners actively engaged in the carrying out of the illegal contract. Their actions constituted an indictable misdemeanor. The plaintiff, receiver of one of the contracting parties, sought a decree "that an account be taken of all the dealings and transactions, purchases and sales of lard," together with a judgment for his share: the court, after carefully pointing out that the parties "have had no accounting: no admission has been made that a specific sum is due to any one of them: no promise has been made since the completion of the illegal scheme upon which a recovery is sought" declined to grant relief. In *Semenowich* v. *Melnyk, supra,* a debtor who was heavily in debt, made a conveyance to defraud his creditors; since all the parties before the court participated in the fraudulent scheme it was held none were entitled to equitable relief. In *Sewell* v. *Sewell, supra,* the plaintiff sought the return of some shares of stock which he had transferred to the defendant, his mother, either for a consideration or to defraud existing creditors; it was held he could not recover. In *Gaines* v. *Sawyer,*

*supra,* the plaintiff sought relief upon the promise of a transferee to return a certificate for some shares of capital stock which he had given to the transferee so as to defraud his wife who had instituted a suit for a divorce. Relief was denied. In *Pollock* v. *Pollock, supra,* a conveyance was taken in the name of the wife, because the husband had just been sued, his property attached, and "he wished to prevent their premises being taken for his obligation," it was held that he was not entitled to the aid of a court of equity to establish a resulting trust in his favor. In *Rosenbaum* v. *Huebner, supra,* the owner conveyed to his son-in-law and had the latter convey to the former's three children some property so as to put it beyond the reach of a judgment in an action then pending. Based upon the principles of law applicable to conveyances to defraud creditors the conveyance was undisturbed. *Brady* v. *Huber, supra,* was similar.

It will be observed that in *Dunton* v. *Dunton, McMullen* v. *Hoffman,* and *Leonard* v. *Poole,* the complainant in each instance was seeking the enforcement of an illegal contract. In the first she sought to recover bonds and other evidences of wealth representing the fruits of her illicit amours; in the two other cases an accounting was sought of the profits of an unlawful contract. The moving parties in these three cases as in all of the large number of cases previously reviewed, found themselves in the predicament where they were compelled to rely directly upon transactions which were either illegal or opposed to public policy. In some the connection between the cause of suit and the illegal transaction was more noticeable than in others; for instance in the bribe case the connection was direct; the same is true in the lard

case; while in the cases where the plaintiff sought the court's aid to relieve him from an unprofitable condition into which his fraud had placed him, as for instance *Reid* v. *Multnomah County, supra,* later developments had shoved the illegal transaction one brief epoch farther into the background.

In all of these cases it was the close relationship between the cause of suit and the fraudulent transaction that caused the court to repel the suitor. And in practically all of them there can be found utterances that if the connection was more remote a different result might have followed. Thus, for instance, in the lard case the court mentioned that it was the illegal transaction itself which the plaintiff desired enforced and not some new promise based upon the old. In *Rosenkrantz* v. *Barde, supra,* Mr. Justice BURNETT made mention that in *McDonald* v. *Lund,* 13 Wash. 412 (43 Pac. 348), "the court held that the illegal contract to engage in gaming had been fully executed and had passed into oblivion; that the liability of the defendant depended not at all upon that alleged iniquitous covenant but upon the new and different stipulation whereby the parties divided the money and legitimately agreed upon the share that each was to have." In *Pitzele* v. *Cohn,* 217 Ill. 3 (75 N. E. 392), the court after saying "the wrongdoing which will defeat a recovery on the ground that a litigant does not come into a court of equity with clean hands must be in regard to the matter in litigation, and does not apply to misconduct of the complainant in other matters not immediately connected with the then pending litigation," quotes from *Phelen* v. *Clark,* 19 Conn. 421 (50 Am. Dec. 253) : "We suppose it to be a well settled doctrine that, if a plaintiff requires any aid from an illegal transaction to establish his de-

mand, he cannot recover it, or, in other words, if he is unable to support it without relying upon an unlawful agreement between himself and the defendant, he must fail. But if the parties had been engaged in business either *malum in se* or merely prohibited by law, yet if the cause of action be unconnected with the illegal act and is founded upon a distinct and collateral consideration, it will not be affected by their former unlawful conduct." In *Monahan* v. *Monahan*, 77 Vt. 133 (70 L. R. A. 935, 59 Atl. 169), the court stated: "The test whether a demand connected with an illegal transaction is capable of being enforced at law is whether the plaintiff requires the aid of the illegal transaction to establish his case." In *Horbach* v. *Coyle, supra,* the court in applying the test resorted for aid to a rule formulated and expressed in 3 Williston on Contracts, Section 1753:

"The test is often suggested, as determining whether the relation of an illegal transaction is sufficiently close to the plaintiff's alleged cause of action to preclude recovery, that if enforcement of the plaintiff's claim does not require aid or proof of the illegal contract or transaction, the plaintiff may recover. As a negative test this seems sound; that is, a plaintiff cannot be allowed to recover if as part of his case he is compelled to allege and prove unlawful acts or agreements, but the converse does not seem equally true. Even though his case can be made out without indicating anything unlawful proof must be admissible to show that the plaintiff is endeavoring to enforce an obligation which is part of, or so closely connected with an unlawful plan, as to make recovery opposed to public policy. 'The line of proximity will vary somewhat according to the gravity of the evil apprehended.' Parol evidence is always competent to show that a written contract, though lawful on its face, was illegal or part of an illegal transaction; and

illegality if serious need not be pleaded or urged to enable the court to act upon it.''

A further review of the cases is undesirable; the remaining cases suggested in defendant's brief merely illustrate the application of the foregoing principles to situations wherein the complainant sought the enforcement of some right directly connected with an illegal transaction to which he was forced to resort for some of the elements of his cause of suit. In the able brief of the plaintiff, we find numerous cases suggested in which (by way of illustration, *Planters' Bank* v. *Union Bank of La.*, 16 Wall. 483 (21 L. Ed. 473), a subsequent act created a new jural right and shoved the illegal act so far into the background that the court refused to ''unravel'' the transactions to discover the iniquity; other cases cited by the plaintiff, of which *Camors-McConnell Co.* v. *McConnell*, 140 Fed. 412, and *Fuller* v. *Berger*, 120 Fed. 274 (65 L. R. A. 381), are good examples, involved causes of action in which the plaintiff was not compelled to bring forward and count upon his own wrong.

■ We revert, therefore, once more to the evidence for the purpose of determining whether the illegal transactions proven are so closely identified with the rights which the plaintiff invites this court to enforce that his cause of suit cannot be established without drawing upon them for support. As we saw before a factor which induced the purchase of the 11th Street property was its adaptability for the plaintiff's illegal occupation. To his new purchase he took the two women, and made it profitable for them to remain there; outward appearances indicated they were the owners of the property. Behind the cloak of decency and respectability created by their presence he plied his illegal business. Without doubt the mask

thus created made his comings and goings safer, and afforded a security which was otherwise unobtainable. This illegal transaction was inextricably interwoven with the purchase of the property; it was as much a part of the woof and warp of the transaction as was defendant's promise to convey upon request. The plaintiff is, therefore, in the same situation as was the moving parties in *Reid* v. *Multnomah County, supra,* and *Baker* v. *Couch, supra,* that is, he asks the aid of this court to extricate him from the predicament into which his fraud has cast him. The relief will be denied as to the 11th Street property.

But the situation in regard to the 12th Street property is quite different. That was not purchased when his liquor stores had only the dubious protection afforded by a family garage, and he was not then on the verge of ejectment from an apartment house where he plied his illegal traffic. It was purchased for an investment, and was never used for any illegal business. He never resided there, and the defendant made her abode there only intermittently. Its purchase was unaccompanied with any expectation that its respectability would be reflected upon his iniquity. There is, therefore, nothing in the principle of law so far examined which should reject the plaintiff's suit in regard to the 12th Street property.

But the defendant contends that because the plaintiff referred to his illegal occupation as a hazardous business, when he explained why he had the conveyances made to the defendant, the principles of law applicable to conveyances in fraud of creditors demand that his suit should be dismissed. It is true that one who makes a voluntary conveyance of his property to cheat a criminal prosecution will not be aided by a court of equity to the return thereof:

*Tantum* v. *Miller,* 11 N. J. Eq. 551; *Morrison* v. *Juden,* 145 Mo. 282 (46 S. W. 994), but we do not believe that we would be justified in holding that the plaintiff's request for a conveyance to the defendant was intended as an act to defraud his creditors or the prosecuting officials. He desired a conveyance to a third party because he was in the illegal liquor business and regarded it as hazardous. Peculiarly enough his tongue selected the word "hazardous": one who is about to engage in a hazardous business and precedes it by a voluntary conveyance of his property so as to force the losses upon his creditors in the event of a disastrous outcome, will not be assisted to a return thereof: Pomeroy, Eq. Juris. (4 ed.), § 973; *Todd* v. *Nelson,* 109 N. Y. 316 (16 N. E. 360); *Neuberger* v. *Keim,* 134 N. Y. 35 (31 N. E. 268), and *Leavengood* v. *McGee,* 50 Or. 233 (91 Pac. 453). But it seems to us that the proof is too nebulous to sustain this charge. Upon the defendant there rested the burden of proof; she was an associate, confidant, and crony of the plaintiff at the times when these transactions took place; no privilege protected his communications to her. She was most voluble upon all other subjects, and yet upon this important phase of the inquiry she affords us but little help in trying to determine what hazards he had reference to when he thus described his occupation. In fact, the defendant, as a witness, made no claim that the plaintiff had the conveyance made to her to defraud his creditors, or anyone else; she insistently asserted her contention of absolute ownership. But, reverting to the plaintiff's description of his business as "hazardous," it is altogether possible that he may have had reference to the physical hazards, or that he was thinking of the precarious condition of a supposedly

wealthy bootlegger among the various habitues of the underworld. The record submits no contention that any law enforcement agency ever made any charge against the plaintiff or his property. There is no evidence that when the plaintiff had his property conveyed to the defendant he was in debt. Upon the other hand he was at that time the owner of a mining property which he apparently deemed valuable. In the absence of substantial proof that he had reference to the financial or penal hazards, we must dismiss this charge as unsustained by the burden which the defendant assumed when she took up the charge; we so hold.

■ We assume that it is unnecessary to cite authority that we were justified in investigating the charges of illegality even though the pleadings were silent upon that subject; this proof was received without objection.

All other matters argued in the briefs have received our very careful consideration.

The decree of the lower court will be modified in regard to the 11th Street property. Costs to neither party.                                      MODIFIED.

COSHOW, C. J., dissents.

McBRIDE and BROWN, JJ., concur.